## EDWARDS *et al., Appellants,* v. THOMAS.

1. **Partnership**; DEATH OF PARTNER. Death, ordinarily, accomplishes the dissolution of a partnership; but it is otherwise when there is an express stipulation to the contrary in the articles of copartnership.

2. **Agency**: POWERS OF CASHIER AND FINANCIAL AGENT. One who is authorized to act as cashier and financial agent of a firm which is in the habit of taking commercial paper in the transaction of its business, has authority to endorse such paper in the name of the firm.

3. **Scope of Agency,** HOW SHOWN. The authority of an agent to act in a given manner, may be inferred from the mere fact and nature of his employment, or from long continued and repeated acts of acquiescence by his employer.

4. **Unauthorized Accommodation Paper**: RIGHTS OF PURCHASER: NOTICE. As against a purchaser of negotiable paper endorsed by an agent in the name of his principal, it is no defense that the endorsement was made, not for the benefit of the principal, but for the accommodation of a third party, unless the purchaser took with notice of that fact. Positive and direct testimony is not necessary to charge him with notice; it may be inferred from facts proven; but mere circumstances sufficient to put a prudent man on inquiry will not do. The fact that the name of the party accommodated appears on the paper as last endorser does not, as matter of law, impart such notice.

5. **Statements of Agent.** Third persons have a right to rely upon the statements of an agent as to the existence of such extrinsic matters relating to his agency as lie within his own peculiar knowledge.

6. **Notice of Protest.** It is the duty of the holder of dishonored paper to direct the notary where and to whom to send notice of protest; and if one holding such paper endorsed by a firm, knows that the former manager of the business of the firm has been displaced by another, but fails to inform the notary of the change, and the notary gives notice of protest to the former manager at the old place of business, as he had done on a previous occasion, such notice is insufficient to bind the firm, notwithstanding the failure of the new manager to give notice that the business of the firm is no longer conducted at that place, and to remove the old sign of the firm.

*Appeal from St. Louis Court of Appeals.*

The principal defense relied on was that Drew had endorsed the note sued on in the name of the Dock Company for the accommodation of T. P. Morse & Co., without the

knowledge or consent of the company. Among the declarations of law prayed by the plaintiff and refused by the court, were the following:

6. If the court, sitting as a jury, finds that the plaintiffs purchased the note sued on, or the original note of which the former was a renewal, of R. M. Renick & Co., brokers, into whose hands the general financial agent in charge of the business of the Sectional Dock Co., a partnership of which defendants were members, had placed the same for discount, relying upon representations made to them by said brokers, that the proceeds of the note were intended for the benefit of the said Sectional Dock Co., the court declares that it is immaterial for the purposes of this action whether said representations were true or false; and that the defendants are bound by said representions, whether true or false.

10. If the court, sitting as a jury, finds from the evidence that the defendants were members of the firm of the Sectional Dock Co. in the petition mentioned; that said firm, by its general financial agent, occupied or used conjointly with the firm of T. P. Morse & Co., an office at the corner of 3rd and Olive streets, in St. Louis, Missouri, and had so done for a long time prior to the making of the note sued on, and continued so to do for a considerable time afterwards, and until the time of the appointment of Daniel G. Taylor, as administrator of said firm estate of the Sectional Dock Co., and had signs at said office indicating the same as its place of business, which signs were known to the said administrator to be there after he was appointed, but were not removed by him and remained at said office until after the maturity of said note; that said administrator did not set up at said office any sign indicating a removal of said office of the Sectional Dock Co., nor did he indicate in his published advertisements of his appointment, nor in any other public manner, the place where he kept his office for the business of said company; that the said notary who protested the note sued on, had previously

gone to the same office to present a note of which the Sectional Dock Co. was maker, and had there been directed to the place where he might find the financial agent of the company dining, and having gone to the place indicated, he presented the note to said agent, and it was paid; that the notary had no notice of the removal of the office of said Sectional Dock Co., from said office, and did not know that said financial agent was no longer such; that during business hours on the day of the maturity of the note sued on, the notary left notice of the dishonor of said note at said office with the person who had been previously the financial agent of said company, and, as such, had endorsed said note with the addition of his name as such agent, and who was then found by said notary in said office in charge thereof; then the court declares the law to be, that such service of the notice of the dishonor of said note is sufficient, notwithstanding the fact that said administrator had previously qualified as administrator of said company, and was then carrying on the business thereof as such, and said former agent had no power or authority to act for said company, and the business of said company was then in fact, but without the knowledge of said notary, conducted at another and different office in said city, than said office at Third and Olive streets.

Among the declarations of law prayed by defendants, and given by the court, were the following:

1.    The defendants are not liable in this action, unless the court finds from the evidence, that they, together with John D. Daggett, Ann Eliza Hartshorn, wife of Saunders W. Hartshorn, Robert C. Rogers, executor of Patrick Rogers, constituted the firm, or copartnership known as "Sectional Dock Company," as alleged in the petition.

3.    The power or authority from the "Sectional Dock Company" to Charles Drew, Jr., to endorse the name of said company upon the note sued on, cannot be implied from the employment of said Drew as financial agent and

cashier of said company, nor from the character and course of business which said company intrusted to his management and control, and the plaintiffs when they took said note were by the face of said endorsement put to inquiry as to the authority of said Drew to make said endorsement.

4. No written power or authority from the " Sectional Dock Company," authorizing or empowering Charles Drew, Jr., to endorse the name of said company on the note in question, having been shown, the authority or right to make said endorsement, cannot be implied from the employment of said Charles Drew, Jr., as financial agent and cashier of said company, nor from the character and course of business which said company intrusted to his management and control.

13. If it is found from the evidence in the case, that the note in suit, was discounted or sold for the benefit and accommodation of T. P. Morse & Co., and that Charles Drew, Jr., had no authority from the Sectional Dock Company to endorse their name on notes for the accommodation of said Morse & Co., and that there were such circumstances attending the making, endorsement and sale of said note, known to the purchasers or their agent, as should have put prudent men on inquiry whether or not said Drew was authorized to make such endorsement in the name of said company, then the court is requested to declare the law to be that defendants are not liable.

Plaintiffs excepted to the giving and refusing of these instructions.

*John G. Chandler* for appellants.

1. The facts from which the partnership was to be inferred were undisputed. Defendants were partners. Coll. on Part., §§ 601, 603.

2. If anything is well established in law, it is that the authority of the agent may be proved by implication.

2 Greenl. Ev., §§ 60, 61; Story Agency, §§ 45, 50; *Cobb v. Lunt*, 4 Greenleaf 503; *Dows v. Greene*, 16 Barb. 72.

3. Although a general authority to endorse was proved by overwhelming testimony, and then admitted at the bar, the court held that there was no evidence of authority to endorse the note in suit. That is, the plaintiffs were bound to prove by writing the authority of the agent to endorse either the identical note in suit, or notes to be used for the identical purposes for which that was used by the agent. Neither of these propositions has any legal support. Story on Agency, § 73; *North River Bank v. Aymar*, 3 Hill 262; *Farmers' Bank v. Butchers' Bank*, 14 N. Y. 624; *Smith v. Clark Co.*, 54 Mo. 58, 77; 1 Parsons on Notes and Bills, 108; *Exchange Bank v. Monteath*, 17 Barb. 171; *Bank v. Macleod*, 7 Moore P. C. 35; *Bank v. Fagan*, 7 Moore P. C. 61.

4. The note was endorsed in the name of the company, with the addition of the agent's name and official designation. This constituted a representation upon the paper itself, that it was endorsed in the business and for the benefit of the principal. So endorsed, it was put, by the general agent of the company, into the hands of the brokers for discount; they offered it to plaintiffs expressly declaring that it was for the benefit of the company, and plaintiffs relying upon those representations bought it. They had a right to so rely, and defendants are bound by the representations, whether true or false. 3 Hill 67; *Farmers' Bank v. Butchers' Bank*, 14 N. Y. 623; *Exchange Bank v. Monteath*, 26 N. Y. 505; *New York R. R. v. Schuyler*, 34 N. Y. 30; *Westfield Bank v. Cornen*, 37 N. Y. 320; *Bird v. Daggett*, 97 Mass. 494; *Madison R. R. v. Norwich Sav. Soc.*, 14 Ind. 457; *De Voss v. Richmond*, 18 Gratt. 338; 2 Kent Com. (12th Ed.) 621, note; *Fairlie v. Hastings*, 10 Ves. 125; 1 Phil. Ev. (5th Am. Ed.) 507, 508, 516; *Perkins v. Burnett*, 2 Root 30; 1 Greenl. Ev. §§ 27, 207, 208; Kerr on Fraud and Mist. 111; *Wilson v. Fuller*, 3 Q. B. 68, 77; Broom Leg. Max. 755.

5. The evidence shows that so far from plaintiffs having notice of any intended misapplication of the proceeds of the discount, all the facts and circumstances attending the negotiation tended to prevent suspicion. Notice means knowledge, and that of some distinct fact showing that Drew had misapplied, or intended to misapply, the proceeds. We look in vain for such a fact brought to the knowledge of plaintiffs. *Horton v. Bayne*, 52 Mo. 531; *Lemoine v. Bank*, 1 C. L. J. 529; *Hamilton v. Marks*, 63 Mo. 167; *Collins v. Gilbert*, 94 U. S. 753. These cases establish the rule that the evidence must show actual notice, not merely suspicious circumstances.

6. The notice of protest was sufficient. Drew had for years and notoriously been the general financial agent of defendants' firm. The office at Third and Olive streets had for years, and notoriously, been a place of business of defendants' firm; and continued to be. held out to the world as such until after the service of the notice of protest. Taylor knew that this office had been used as an office of the firm, and that there were signs there indicating it as such, yet when he was appointed he neither removed the signs, nor put up any sign at the office showing that it was no longer to be used by defendants' firm, or by him—nor did he state in the advertisement of his appointment either where the place of business was to be, or that Drew had been removed from his agency. The notary knew this to have been the place of business of the firm, knew of no other, and had previously, in his official character, presented a note of the firm at the same place. He states that he knew of no change either in the office or the agency. As to the latter point only, the removal of Drew, the defense attempted to contradict him. The defendants themselves took no steps whatever to inform the world of the removal of the office or the agent. Reasonable diligence in serving the notice is all that is requisite. The holder is not bound to see to it that the notice is brought home to the party. *Bank v. Lawrence*, 1 Pet. 578; *Lewiston*

*Bank v. Leonard*, 43 Me. 157 ; *Sanderson v. Reinstadler*, 31 Mo. 483 ; 1 Pars. Notes and Bills, 477 ; *Edson v. Jacobs*, 14 La. 494; *Williams v. U. S. Bank*, 2 Pet. 96; *Jones v. Mansker*, 15 La. 51 ; *Com. Bank v. Gove*, Id. 113 ; *Lord v. Appleton*, 15 Me. 270 ; *Bank v. Merle*, 2 Rob. La. 117 ; *Jacobs v. Town*, 2 La. Ann. 964; 1 Pars. Contr. 71 ; 1 Greenl. Ev. § 41 ; *Hazard v. Treadwell*, Stra. 506 ; *Spencer v. Wilson*, 4 Munf. 130 ; Story on Part., Sec. 16 ; *Pope v. Risley*, 23 Mo. 186; *N. Y. & N. H. R. R. Co. v. Schuyler*, 34 N. Y. 59; Edwards on Bills and Notes, 612 (2nd Ed.) ; *Bank v. Phillips*, 3 Wend. 408; *Bank v. Davidson*, 5 Wend. 537, 587 ; *Union Bank v. Govan*, 10 Sm. & M. 334; *Lewiston Bank v. Leonard*, 43 Me. 144, 157 ; *Cocke v. Bank*, 6 Humph. 51 ; *Dabney v. Stidger*, 4 Smedes & M. 749 ; 1 Pars on Notes and Bills, 502 ; Edwards on Bills and Notes, 631, (2nd Ed.) ; Story on Prom. Notes, Sec. 310 ; *Fourth Nat. Bank v. Heuschen*, 52 Mo. 207.

*D. T. Jewett and J. M. Krum* for respondents.

The note in the present case was not signed with the personal signatures of the parties as in *Hamilton v. Marks.* The signature by agent was notice upon the face of the paper, and brings the present case fully within the principal of *Goodman v. Simonds*, 20 How. 343, and *Fowler v. Brantley*, 14 Pet. 318. So does the endorsement by Drew as last endorser, which, as the evidence shows, indicated that the discount was for his benefit. Other facts were also known to plaintiffs, or the go-between, Renick; they knew the business of the Dock company, that these were not business notes of that company, that they were made in a shape to suit purchasers, that when plaintiffs refused to take one $6,000 note, but were willing to take two $3,000 notes, Drew pulled the two notes out of his pocket ready made. They also knew of the firm of T. P. Morse & Co., and that Morse & Daggett, the makers of the note, were of that firm. Plaintiffs had no right to take Drew's state-

ments as to what the money was wanted for, until they knew that he was the authorized agent of defendants. They were not justified in depending on such vague and unauthorized information, obtained in such a doubtful way. The face of the paper notified them that the last endorser was legally the beneficiary of the discount, and was an agent only, with what powers they did not know, and never inquired; and that he was pledging his personal liability to get the money; that T. P. Morse, a young man known not to be of the Dock company, was also on the paper; in short, that it was not the paper of the company. All this was not overcome by Drew's statement, that the paper was made for the benefit of the company.

2. The company was officially dead when the notice of protest was given, and the man, (Drew,) to whom it was given, had no connection with it. There is very little doubt that he never had authority to receive notice of protest personally. Story on Prom. Notes, § 309; Bailey on Bills, p. 274; Parsons on Notes & Bills, p. 500.

SHERWOOD, C. J.—This suit was brought by the plaintiffs, partners, as Edwards, Matthews & Co., against the defendants, Mary Thomas and Sarah L. Morse, as partners in a co-partnership known as the Sectional Dock Company, upon a promissory note, of which the following is a copy:

"$3,000.                  St. Louis, March 19th, 1873.

"Four months after date, we promise to pay to the order of Sectional Dock Co., Three Thousand Dollars, for value received, negotiable and payable without defalcation or discount, and with interest from maturity, at the rate of ten per cent. per annum.

"THOS. P. MORSE,
"JOHN D. DAGGETT."

Endorsed:

"SECTIONAL DOCK CO.
By CHARLES DREW, JR., Fin. Agt.
"CHARLES DREW, JR.'

The petition averred that the defendants, Mary Thomas and Sarah L. Morse, at the date of the note, were, together with one John D. Daggett, one Ann Eliza Hartshorn, wife of Saunders W. Hartshorn, and one Robert C. Rogers, executor of Patrick Rogers, deceased, partners, doing business under the firm name of Sectional Dock Company—said Eliza Hartshorn's interest in said firm being separate estate, and said John D. Daggett being her trustee. Then followed averments of the making and delivery of the note to the payee, the endorsements in succession, and the delivery for value to plaintiffs before maturity, due demand of payment, dishonor, and protest and notice to the endorsers. The answers of the defendants separately put in issue all the allegations of the petition, except plaintiffs' partnership, and were verified by affidavit. The cause was tried by the court, and judgment rendered for the defendants, on appeal to general term, judgment affirmed, and also in the St. Louis Court of Appeals.

A partnership, under the name of the Sectional Dock Company, was formed some 30 or 40 years ago, for the purpose of carrying on the business of docking and repairing steamboats and other vessels, at St. Louis, and then consisted of John D. Daggett, Mary Thomas, Thomas T. Morse, Patrick Rogers and Ann Eliza Hartshorn, wife of Saunders W. Hartshorn, whose trustee was Rowland Ellis, Jr. In 1857 a partnership article was signed by the several partners, Rowland Ellis, Jr.'s name being signed by attorney, S. W. Hartshorn, husband of Mrs. Hartshorn. This article provided, amongst other things, " that in the event of the death of either party to the agreement, the co-partnership should not, on that account, be dissolved, but the interest of such deceased party should be continued and represented by the legal representative of such deceased party." In 1866, Thomas T. Morse died, and immediately thereafter his widow, the defendant, Sarah L. Morse, administered upon his estate, and then at the foot of the partnership article made and signed the follow-

ing memorandum : "I approve and accept the above. Aug. 13th, 1866. Sarah L. Morse." Thereafter the business continued as before, Mrs. Morse representing her deceased husband's interest, and drawing the dividends. In the latter part of 1870, Patrick Rogers died at Cincinnati, Ohio, where he had resided, leaving a will, by which "he appointed his son, Robert C. Rogers, executor and trustee of his estate, and directed him to continue his, (testator's) interest in sundry enterprises, and, amongst others, in this Sectional Dock Company, at St. Louis, and that this interest be represented by the executor in his, (testator's) stead, until such time as in the executor's judgment it should be most advantageous to the estate to sell out or settle up and close his share." This will was duly proved at Cincinnati, and the executor qualified there, but the will was not then filed, or administration taken out in Missouri. But as directed by the will, Robert C. Rogers took charge of his father's interest in this company, participated in its management, and from time to time drew dividends. The relations of the partners continued unchanged, until in June, 1873, on the 10th of which month Robert C. Rogers also died. On the 9th day of June, 1873, a certified copy of Patrick Rogers' will was filed in the probate court of St. Louis county, Missouri, and on the 10th day of June, 1873, administration, with the will annexed, upon the estate here, was committed to Daniel G. Taylor. About the same time, John D. Daggett, Sarah L. Morse and Mary Thomas, executed a relinquishment of their right to administer upon the partnership, in which they describe themselves as the "sole surviving members of the co-partnership known as the Sectional Dry Docks Company, of St. Louis, residents of the State of Missouri," and consent that said Taylor should administer thereon. This paper was filed in the probate court, which on the 8th day of July, 1873, granted to Taylor authority to administer upon the partnership. About 1863, John D. Dag-

gett was substituted as trustee for Mrs. Hartshorn, and continued so until after the making of the note in suit.

The defendants denied that the facts above stated constituted them partners as in the petition alleged. The business of the Sectional Dock Company, for many years, was managed, not by the partners in person, but by a general agent appointed by them, and whom they designated sometimes secretary, and at others cashier and financial agent. For some years prior to 1867, William Daggett was this general agent, but in that year he was displaced, and Charles Drew, Jr., a son-in-law of John D. Daggett, was appointed in his place, and he continued in the management until the grant of administration upon the partnership estate to Daniel G. Taylor, on the 8th day of July, 1873. Drew's powers were very great; he kept the books of the concern, collected all the bills, took all the money and paid it out, kept a bank account at the First National Bank, and one at the People Savings Bank. The Docks frequently took in notes as part payment of bills, and Drew negotiated them. During the last two years of his administration, Drew signed checks, notes and other documents, for that company, as "financial agent," prior to that period as "secretary." Drew's name was frequently signed to checks and notes in both ways; and checks were given to Rogers, Hartshorn, Mrs. Morse, and John D. Daggett, by Drew, and these checks were signed with this designation; Drew always signed checks that way—the money could not be got if he did not; checks for Mary Thomas, were made out in the same way. The Dock Company were repairing and docking steamboats and barges, and vessels in the river. In the transaction of their business they took commercial paper, which was made payable to the St. Louis Sectional Dock Company; this paper was endorsed; and when endorsed, the endorsement was, "Sectional Dock Company, by Charles Drew, Jr., as secretary or financial agent," one or the other. The powers conferred upon Drew were extraordinary in this, that they were exclusive

of the partners themselves.   Mr. Morse, who was not only a son of one of the defendants, but had been in the employ of the company himself, says that none of the partners had a right to sign the name of the company, not Capt. Daggett, or any other partner; nobody but Drew.

The evidence also showed that Daggett, upon the removal of his son, and the appointment of Drew, had made the statement to the First National Bank's officers that Drew had full authority to transact all the financial business of the Sectional Dock Company, by endorsement, &c. A letter dated June 12th, 1872, at Cincinnati, from R. A. Rogers, shows also a similar recognition, as well on his part as that of Hartshorn of the financial agency of Drew.   This letter even shows that Rogers was aware of and approved Drew's extension of accommodation to the firm of T. P. Morse & Co., and that Hartshorn was at least aware of such extension; Mrs. Morse, too, as late as February 26th, 1873, addressed a letter to Drew as "Financial Agent of Sectional Dock Company," referring to the concern as a partnership, to a dividend due her as a member of it, and signing her name as "administratrix." An instrument in the nature of a power of attorney was also offered in evidence, (held by the court defectively executed as to Mrs. Hartshorn,) as follows:  "Know all men by these presents, That we, John D. Daggett, Sarah L. Morse, admx., Mary Thomas and Eliza Hartshorn, and Robert C. Rogers, exctr., partners in the Sectional Dock Company, of St. Louis Missouri, have made, constituted and appointed, and by these presents do make, constitute and appoint Chas. Drew, Jr., of St. Louis, Missouri, the true and lawful cashier and financial agent of said Sectional Dock Company; and in the name of the same to do and perform all and every act and thing whatsoever required and necessary to be done in the premises, as we might or could do if personally present—hereby ratifying and confirming all the said Charles Drew, Jr., as said cash-

ier and financial agent shall lawfully do, or cause to be done by virtue hereof.

"In witness whereof, we have hereunto subscribed our names this 18th day of July, 1871.

Signed,          "JOHN D. DAGGETT,

"SARAH L. MORSE, Administratrix,

"MARY THOMAS,

"ANN E. HARTSHORN,

"ROBERT C. ROGERS, Trustee

of P. Rogers' Estate,

"By S. W. HARTSHORN, Att'y in fact."

The paper was acknowledged by John D. Daggett, Sarah L. Morse and Mary Thomas, in St. Louis; and Mrs. Hartshorn, and S. W. Hartshorn, as att'y in fact for Robert C. Rogers, Cincinnati, as appears by the certificates attached. There was also appended the following, the execution of which was proved:

"Mr. S. W. Hartshorn is authorized to transact all business concerning St. Louis Sectional Dock Company, as far as my interest therein is concerned.

"ROBERT C. ROGERS,

Trustee of P. Rogers' Estate."

It was further shown that Hartshorn had for years managed his wife's interest; that he drew dividends, attended meetings of the company, notably a meeting held at Mrs. Morse's house, in July, 1872, when all the interests were represented, there being present Mr. Hartshorn, Robert C. Rogers, Mrs. Thomas, Mrs. Morse, Capt. Daggett, Thos. P. Morse and Mr. Drew. He frequently came over from Cincinnati sometimes with, and sometimes without Rogers, to look after the management, and Thos. P. Morse testifies to sundry conversations had with him as to the company's business. Several letters of his and Rogers' were also read in evidence, showing his interest in the management as well as that of Rogers, and that Hartshorn recognized Drew as having the whole management of the business; letters were to the same effect. Much more evi-

dence of a similar sort was adduced, and finally defendants' counsel admitted that Drew was financial agent of the Sectional Dock Company, for all legitimate purposes of its business. The only purpose, it seems for which the just quoted instrument was admitted by the court, was " to establish the fact that these parties were dealing with this concern as a partnership," and not because the paper was regarded competent to prove authority conferred by the partnership upon Drew to execute and endorse notes.

I. Death, ordinarily, accomplishes the dissolution of a co-partnership. Provision, however, may be made against such a contingency as was done in the present instance, by providing in the articles that the interest of the deceased partner shall continue, and be conducted by the legal representative of the decedent. (Coll. on Part., §§ 601, 603; Sto. on Part., §§ 5, 195, 196, 199, and cases cited.) And if there were any option on the part of Mrs. Morse, in regard to acceptance of the provision referred to, (Sto. on Part., § 201), this option was exercised by her endorsement on the articles of co-partnership, as above shown. The proof of the partnership, and their holding themselves out to the world as such, is abundantly present throughout the record. And if any technical lack of authority is shown as to Mrs. Hartshorn in the execution of the partnership articles in 1857, or the written authority to Drew in 1871, this lack was otherwise supplied, for John D. Daggett was appointed trustee of Mrs. Hartshorn in 1863, and fully represented her interests, at least it was his duty so to do, and her husband, with the consent of her trustee, and with her consent, it must be presumed, drew dividends for her for years. But even if Mrs. Hartshorn was not thus represented, this would not limit or lessen the liability of those of the partners who were present, or properly represented, and who acted as partners, in the transaction of business and the reception of dividends under the name and style of the Sectional Dock Company. From the declaration given, the court

*1. PARTNERSHIP: death of partner.*

below must have regarded the co-partnership established as to all the parties named in the petition.

II. And we regard the agency of Drew to transact the general financial business of the concern, as amply es-

2. AGENCY: pow-ers of cashier and financial agent. tablished. The words employed in the instrument above set forth, would, it would seem, readily bear no other signification. If "true and lawful cashier and financial agent of said Sectional Dock Company," would not necessarily import and impart authority to endorse notes, discount them, draw checks and make deposits, it is not a little difficult to see what their meaning would be. In *First National Bank v. Gay*, (63 Mo. 33,) we said: "If the father when stating 'that whenever his son wanted accommodation at the bank, he was authorized to use or sign his name,' did not by such language intend to confer authority for signing his name to a note or notes as security, it is impossible to give any meaning or force to his utterances. He must have meant to confer such authority if he meant anything. And it will not be assumed that the language of the father was a mere idle declaration. The law, therefore, will give effect to such evident intention, in the usual and ordinary manner in which such intention is commonly effectuated."

But leaving altogether out of view the written authorization, and having regard alone to the other circum-

3. SCOPE OF AGEN-BY, how shown. stances already noted, and others of like sort, no trouble would be experienced in arriving at the conclusion that Drew was fully authorized to do that which he did for years, viz: Draw checks, endorse and discount notes, make and withdraw deposits, &c., &c. The power to do such acts arises, of necessity, from the duties devolved on him by his position, and the relations he bore to the company; and the fact that it was his custom to perform such acts for a series of years, with the evident knowledge and presumed acquiescence of the company for which he acted, was authority enough. Instances there are without number, to be found in books, where au-

thority of an agent to act, in a given manner, follows by
inevitable implication, from the mere fact and nature of his
employment, or from long continued and repeated acts of
acquiescence. (Story on Agency, §§ 45, 50, 54, 55, 56,
57, 58, 59, 60, 84, 85, 102, 103, and cases cited; *Elkins v.
Macklish,* Ambler 184; 2 Greenlf. on Ev., §§ 60, 61, and
cases cited; *Washington Mut. Fire Ins. Co. v. St. Mary's
Seminary,* 52 Mo. 480 , *Olcott v. Tioga R. R. Co.,* 27 N. Y.
546; *Hoyt v. Thompson's Extr.* 19 Id. 208; *Bank U. S. v.
Dandridge,* 12 Wheat. 64; *Cobb v. Lunt,* 4 Greenlf. 503;
*Dow v. Greene,* 16 Barb. 72.) The giving of any declara-
tion, therefore, which required a written authority to sup-
port Drew's endorsement, and which denied that the power
to thus endorse could be shown by implication, acquies-
cence or ratification, was plainly erroneous. Besides all
that, as above seen, the authority of Drew, for all legiti-
mate purposes of the partnership, was distinctly admitted
at the trial.

III. We are thus led to consider the correctness of
the declaration that the "plaintiffs, when they took said
4. UNAUTHORIZED note, were by the face of said endorsement
ACCOMMODATION
PAPER: rights of put to inquiry as to the authority of said
purchaser: notice.
Drew to make said endorsement." When the trial of this
cause occurred, the doctrine asserted in *Hamilton v. Marks,*
(52 Mo. 78,) was in force. Since then, as is well known,
that doctrine has been justly exploded by a more recent
decision in the same case (63 Mo. 167). Under the last
ruling, merely putting a party about to purchase negotia-
ble paper upon inquiry is not *per se* sufficient; nor is gross
negligence. There must be evidence of *mala fides.* As a
matter of course bad faith is not to be established by di-
rect evidence alone, but, like fraud, its congener, may be
proven by indirect or circumstantial evidence. In *Good-
man v. Harvey,* (4 Ad. & El. 870,) the drawee refused ac-
ceptance of the bill, and it was noted for non-acceptance,
protested, and afterwards transferred to plaintiffs for value.
On the trial, Lord Chief Justice Denman ruled that the

plaintiffs, in purchasing the bill from Levy, with the notarial marks indicative of non-acceptance upon it, " received the bill with a death wound apparent on it," and was, therefore, guilty of gross negligence. Upon a case reserved, however, the same distinguished judge held that " gross negligence may be evidence of *mala fides*, but is not the same thing. We have shaken off the last remnant of the contrary doctrine. Where the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title. The evidence in this case, as to the notarial marks, could only weigh as rendering it less likely that the bill should have been taken in perfect good faith." And accordingly, the rule *nisi* was made absolute.

A more rigid rule seems announced in *Fowler v. Brantly*, (14 Pet. 318,) and also in that of *Andrews v. Pond*, (13 Id. 65). In the former case the note was peculiar in form, not intended for outside circulation, and the figures 169, placed on the face of the paper, was common to rejected paper, in conformity to the custom of that particular bank, with which, under the special circumstances detailed in evidence, the purchaser must be presumed familiar, and hence he was held as apprised by the face of the paper of its antecedent infirmities. Whether so stringent a rule should prevail in respect of paper expressly intended for outside circulation, and not looking to negotiation in any particular bank, or to being subjected to any local or special custom, was not announced. In *Andrews v. Pond*, *supra*, the notarial marks on the bill would appear to have been the same, in effect, as those in *Goodman v. Harvey*, above cited, and it was held in *Andrews v. Pond*, that a person taking a bill thus dishonored, cannot claim the privileges allowable to a *bona fide* holder, any more than if taking one overdue. This decision is not readily reconcilable with the leading English case just referred to, which overthrew the case of *Gill v. Cubitt*, (3 B. & C. 466). But we have not been able to discover any striking parallelism between those cases and the one at bar. Here, the note

bore no symptoms or tokens of dishonor; no "death wound" apparent on its face; nothing in short which proclaimed *caveat emptor*. The declaration being considered was therefore doubly erroneous. Erroneous, because asserting that by the face of the paper the plaintiffs were put to inquiry; erroneous, because virtually assuming that being put to inquiry was tantamount to a defense. This declaration of law, No. 3, was of a piece with No. 13, also given for defendants, which gave recognition to the now repudiated doctrine concerning putting prudent men on inquiry. It is not to be denied that every circumstance attending the transfer of negotiable paper is to be weighed by the jury, under appropriate instructions; for although as above seen, nothing short of bad faith will invalidate the title of one purchasing for a valuable consideration, yet it is equally undeniable that gross negligence may be cast into the scale, as no insignificant weight in determining whether the paper was "taken in perfect good faith." (*Goodman v. Harvey, supra.*) Under this view, evidence was properly receivable, showing the custom of bankers to place to the credit of the last indorser the funds arising from the instrument discounted; that Daggett, one of the makers, was, to the knowledge of one of the plaintiffs, encumbering his property on the market, and tottering on his financial legs; that plaintiffs made inquiry concerning the authority of Drew to endorse the paper in the way he did, and never (so far as the record shows) pushed that inquiry to any conclusion; that inquiry was also made for whose benefit the discount was to go, and why the Sectional Dock Company wanted money. These, and other incidents of like sort, were all admissible as bearing on the question of gross negligence, and as rendering it less likely that plaintiffs were controlled by good faith in making the purchase. And the custom of the bankers of St. Louis, concerning which the plaintiffs must be presumed familiar, ought, it seems, to exercise no inconsiderable influence with the triers of the facts in endeavoring to ascer-

tain the purchasers' *bona fides*. For although it be true, in this connection, that notice to, means knowledge of, the purchaser, (*Swift v. Tyson*, 16 Pet. 1; *Goodman v. Simonds*, 20 How. 343), yet positive and direct testimony of *mala fides* is seldom attainable. Neither courts nor juries are allowed to shut their eyes to natural and rational inferences, clearly deducible from proven facts. (*Cass Co. v. Green*, *post*; 1 Daniel on Neg. Inst., § 795). Even in criminal cases, the single fresh foot-print of the assassin, near the scene of murder, has weighed heavily in excluding all rational doubt of his guilt; and would it not be altogether monstrous to say that the testimony should be more convincing in a civil case?

But on the .part of plaintiffs, it is not to be forgotten that their inquiries of Renick, from whom they made the

5. STATEMENTS OF AGENT.

purchase, as to whose benefit the money was to go, and why the Sectional Dock Company needed money, seemed to have received a satisfactory reply, when Renick returned with Drew's response, giving what it would appear was a sufficient answer to each of the two interrogatories, that the discount was for the benefit of the Sectional Dock Company, and that the need for the money arose because that company was carrying $50,000 or $60,000 of steamboat paper, which they could not let go to protest without losing the steamboat business. And evidence as to these declarations of Drew was competent, whether they were true or false; in either event they were binding on the company, whose general financial agent he was clearly proven to be—since those declarations were made *dum fervet opus*, in the course of his employment. (Sto. on Agency, §§ 139, 452, and cases cited; 1 Glf. Ev., § 113.) Drew had, for years, been acting as the general financial agent of the Sectional Dock Company, and held out to the world by that company as duly authorized to exercise the powers and perform the functions incident to such agency. His *status* was therefore as notorious as that of a cashier of a bank; as notorious as though ac-

companying all his acts there had been continuous profert made of a written power. In *North River Bank v. Aymar,* 3 Hill 262, the court says: " In speaking of the attorney's acts, I certainly mean to include his declarations made at the time, or in the business which he transacts under the power, for his declarations are part of the *res gestae,* and bind his principal equally with the act to which they relate. They are always received as evidence against the principal. I authorize a man to borrow a sum of money for me. The power being limited, he has no authority to borrow for himself, or his neighbor. He goes to the lender and borrows in my name, showing him my written power, and declaring at the same time that he takes the loan on my account. Both his acts and declarations are evidence against me. A question often arises upon this and the like cases, how far the appointee is responsible for the agent's fidelity. Take it in the instance supposed, "that his acts and professions make out a case within the terms of his authority, is the man who advances his money accountable for the truth or the good faith of a transaction which, so far as he can see and has reason to believe at the time, is in honest conformity with such authority? Take it, that the attorney comes with a falsehood, meaning the loan for his own use, or the use of another whom he desires to accommodate, must the appointee lose his money? He brings his action against the principal, and proves the letter of attorney and note as stated, is it necessary to do more? Or can the principal turn round upon him and show that his attorney was false to his interest, and so infer that the man who trusted to his letter and made a loan apparently according to its purview, must himself be visited with the consequences of the fraud? I confess that, until I heard the argument in the case, I had supposed the mere statement of such a case furnished its own answer, and that to allow such a defense would be pushing the duty of inquiry, on the part of the appointee, far beyond the principle on which it was founded; indeed, to an extent

absolutely impracticable." "When the declarations of an agent are admitted in evidence, they are received, not for the purpose of establishing the truth of the fact stated, but as representations by which the principal is as much bound as if he had made them himself, and which are equally binding, whether the facts stated be true or false." 1 Phil. Ev., (4 Am. Ed.,) 516; *Graff v. P. & S. R. R. Co.*, 31 Penn. 489, 496.

In the *Farmers' & Mechanics' Bank v. The Butchers' & Drovers' Bank*, (16 N. Y. 125,) it was held that the *bona fide* holder for value of a check, negotiable upon its face and certified to be good by the paying teller of the bank on which it was drawn, whose authority to certify was limited to cases where the bank had funds of the drawer in hand sufficient to cover the check, can enforce the payment of the check, although the drawer has no such funds, and the check was certified by the teller without funds, and in violation of his duty, for the mere accommodation of the drawer, and upon his promise that it should never be presented for payment. In that case, Peck, the teller, was in the habit of certifying the checks of customers, with the knowledge of the officers of the bank; was furnished with a book for the express purpose of keeping a memorandum of such checks, and his authority in a proper case was indisputable, and as he was expressly inhibited from certifying in the absence of funds, it was insisted that the bank was therefore not bound. But the court, after quoting with approval the oft quoted remark from Lord Holt, in *Hern v. Nichols*, (1 Salk. 289,) that, "seeing somebody must be a loser by this deceit, it is more reasonable that he that employs and puts confidence in the deceiver should be a loser than a stranger," said, "the reasoning of Lord   *   *   *   Holt applies here with peculiar force. The bank selects its teller, and places him in a position of great responsibility; the trust and confidence thus reposed in him by the bank, leads others to confide in his integrity. Persons having no voice in

his selection, are obliged to deal with the bank through him. If, therefore, while acting in the business of the bank, and within the scope of his employment, so far as is known or can be seen, by the party dealing with him, he is guilty of misrepresentation, ought not the bank to be held responsible ?. It is worthy of consideration that the fact misrepresented in this case is not only one peculiarly within the knowledge of the agent, but one with which he is made acquainted by means of the position in which he is placed by the bank, and which it is his especial province and duty to know, and which could scarcely be definitely ascertained except by application to him. These circumstances would seem to bring the case directly within the principles adopted in *Hern v. Nichols*, and in the subsequent decisions based upon that case." * *

" Where a party dealing with an agent has ascertained that the act of the agent corresponds in every particular in regard to which such party has, or is presumed to have knowledge, with the terms of the power, he may take the representations of the agent as to any extrinsic fact, which rests peculiarly within the knowledge of the agent, and which cannot be ascertained by a comparison of the power with the act done under it." And the court then compares the case before it to one where a partner, who, though having no more abstract authority than a stranger, to execute a negotiable partnership note, for his own benefit or the accommodation of others, yet gives such a note for his own debt, and that note, although void in the hands of one acquainted with its consideration, becomes valid in the hands of a purchaser without notice, and the court then says : " The giving of a note in the partnership name, is a verbal representation that it is given in the partnership business, and if negotiable, this representation is deemed in law to have been made to every subsequent *bona fide* holder of the note." In *Griswold v. Haven*, (25 N. Y. 595,) the same principle finds enunciation, and also in *N. Y. & N. H. R. R. Co. v. Schuyler et al.*, (34 N. Y. 30,) where

a most elaborate discussion of the question occurred, and where it was asserted of the case of *North River Bank v. Aymar, supra,* that though "discrowned by reversal," it "was lifted to its feet and restored to authority by adjudication." I have here quoted thus extensively from the foregoing authorities, because regarding them as peculiarly apposite to the present instance. Here the power to endorse was the power exercised; the legitimate exercise of that power was conceded to Drew at the trial, and was abundantly established by the evidence adduced. If the plaintiffs had instituted comparison between the power exercised and the one actually authorized, no discrepancy could have been discovered, and they had the right to rely upon the representations of the agent as to the truth of those extrinsic matters which lay within his own peculiar knowledge, unless they were apprised of the true state of affairs, either by the additional endorsement which Drew made in his individual capacity, or as the result of inquiries which they may have set on foot, taken in connection with the custom of banks and the other circumstances heretofore noted. We do not incline to the opinion that the additional endorsement on the note would, of itself, as a matter of law, be sufficient to prevent a valid and *bona fide* purcha·e of the note from being made, nor have we been furnished with any authorities going to that extent. In the above remarks, we have sufficiently indicated our views respecting the doctrine of good faith in the purchase of negotiable paper, so far as applicable to the case before us, and now pass to the only question of prominence yet remaining to be discussed.

IV. Drew kept the books of the Sectional Dock Company at its true office at the foot of Lesperance street, some

6. NOTICE OF PRO- two miles from the corner of Third and Olive
TEST.                streets. At the latter place the firm of T. P. Morse & Co., had an office, that firm being composed of T. P. Morse, J. D. Daggett, and Charles Drew. Daggett was a member of the Sectional Dock Company; Drew

did much of the business of the latter company at Third and Olive, and for years, for his own convenience, and, it must be presumed, with the tacit acquiescence of the Sectional Dock Company, had posted two signs, one on the corner of the building, and the other on the window, containing the name of that company; and the notary, Green, had in the January preceding the service of the present notice, gone to the office where these signs were, to demand payment of Drew of a note given or endorsed by him as agent of the Sectional Dock Company. Not finding him there, the notary was directed by a clerk where to find him, he being casually absent, and he was found at the place indicated and the paper taken up. Drew was removed from his position as general financial agent, on the 10th of July, 1873; Taylor was granted letters of administration with the will annexed, on the estate of Patrick Rogers, deceased, on the 10th of June, 1873, and administration granted to him on the partnership estate of the Sectional Dock Company, on the 8th of July next thereafter. Whitaker, one of plaintiffs, was present in the probate court room when counsel were arguing the question of the appointment of Taylor to take charge as administrator of the partnership effects, and afterwards saw and read the following notice, published by Taylor in the city papers, on the 10th of July, two days after his second appointment:

" St. Louis Sectional Dock Co.

" As administrator of the estate of Patrick Rogers, deceased, I have received letters from the St. Louis probate court upon the partnership estate of the St. Louis Sectional Dock Co., and I hereby notify all whom it may concern that no contract or obligation for said partnership is binding unless made by my authority, and I request persons having any claims against said partnership, at once to present to the undersigned, or they will be precluded from the benefits of said estate.

" DANIEL G. TAYLOR.

"Dated July 10th, 1873."

The notice of protest, the sufficiency of which is here questioned, was delivered to Drew at the Third and Olive street office, by the notary, on the 22nd day of July next following Taylor's appointment as administrator of the partnership effects. After demand of payment on Morse and Drew, at the same office, and their refusal, Daggett was not served, though the notary knew he resided in the city. Green, the notary, was apprised by conversations with Garesche, between the 8th and the 22nd of July, that Taylor had been placed in charge of the affairs of the partnership, and Garesche in charge of the Dock Company's books, to overhaul them, but no direct information was by this conversation imparted to the notary as to the removal of Drew as financial agent, or of any removal of the place of business, but the notary was aware, by common rumor, that the Sectional Dock Company did transact business at their dock yard at the foot of Lesperance street. Taylor, after taking charge of the partnership affairs, removed the table and chairs which Drew had used, from the Third and Olive street office, but though aware of the signs Drew had placed there, failed to remove them, or to post any notice there indicative of a removal. Upon this state of facts, the court being asked, declared the law to be that the service of notice was bad.

We have not been without some degree of hesitation in arriving at a conclusion co-incident in this regard, with that reached by the circuit court, but after no little deliberation, have concluded to give that ruling our sanction. And these are our reasons therefor: It must indeed be admitted that Taylor was somewhat derelict in respect of the signs of the Sectional Dock Company, at the corner of Third and Olive streets, but we cannot see that his failure has worked the plaintiffs any hurt, and this, because of the knowledge of which Whitaker, one of them, was possessed. We may lay aside and leave out of view the information which the notary may have acquired, and still that

of plaintiffs was ample. Mr. Parsons says : " A revocation of authority may be made, either expressly or by any action in relation to the subject matter, which is manifestly irreconcilable with the continuance of the authority." (1 Pars. Cont., 71.) The notification given by Taylor in the public prints, and read by Whitaker, was plainly inconsistent with the retention of any authority by Drew. And it was the evident duty of plaintiffs to have commucated the information thus obtained to their agent, the notary. Their *laches* must be regarded, therefore, as his *laches*, and the measure of due diligence which the law requires, as remaining in this instance, unfulfilled. Holding these views, although we regard error as having been committed at the trial, we must affirm the judgment, since the lack of proper service of notice is fatal to the claim of the plaintiffs. All concur.

AFFIRMED.