NEW YORK INDEMNITY CO., APPELLANT, v. ANDREW COUNTY BANK, RESPONDENT.—59 S. W. (2d) 741.

Kansas City Court of Appeals. April 3, 1933.

*Culver & Phillip* for appellant.

*Booher & Wolverton* for respondent.

BLAND, J.—This is a proceeding against the defendant, bank, in liquidation, in which plaintiff, as assignee of the Union Credit Corporation, seeks to have the amounts of five checks, drawn upon the defendant, declared preferential claims. The court refused the relief prayed for and plaintiff has appealed.

The facts show that the checks in question were drawn by the Noland Motor Company upon defendant while it was a going concern. They were made payable to the Union Credit Corporation and delivered by the drawer to one Pickard, employed by the Union Credit Corporation as a collector and adjuster.

The first of these checks was in the sum of $300 and was dated March 30, 1929. It was cashed by Pickard on April 1st of that year. The second check was in the sum of $225 and was dated May 2, 1929. It was cashed by Pickard on May 3rd. The third check was in the sum of $370 and was dated June 11, 1929. It was cashed by Pickard one June 17th. The fourth check was in the sum of $364 and was dated September 21, 1929. It was cashed by Pickard on September 25th. The last check was in the sum of $555.50 and was dated September 23, 1929. It was cashed by Pickard on September 28th. All of these checks were cashed personally by Pickard at the bank while it was a going concern.

The facts further show that the Union Credit Corporation is a finance corporation, located in St. Joseph, and that the Noland Motor Company and the defendant were located at Savannah; that the Union Credit Corporation was engaged in the business of financing retail dealers in automobiles, including one Charley Noland, doing business as the Noland Motor Company, at Savannah. Those dealers, including Noland, who were without sufficient capital to keep a proper stock of cars on hand would apply to the Union Credit Corporation for loans and it would loan upon each car an amount equal to about eighty per cent upon "ninety day acceptances," of its cost at the factory, under an arrangement that the car should remain upon the dealer's floor. This is called financing on the "floor plan." It was the practice of the company to send a man around to the dealers semimonthly to ascertain if the cars upon which it had loans were upon the dealers' floors. In the meantime, if the dealer had made a sale or sales, he would immediately turn over to the Union Credit Corporation the cash he received and if the car was sold upon the time payment plan the installment note and chattel mortgage arising out of the sale would be turned over to it.

Pickard was employed by the Union Credit Corporation to check up the dealers to see if the cars were on the floors and to make collections from such dealers and, also, to collect payments on installment notes from the purchases of cars from the dealers. His company instructed him to collect money and checks and to turn the cash over to it "and once in awhile when he would collect a sizeable check his instructions were, if there was any question about the financia¹ responsibility of the dealer, to secure a bank draft from the bank upon which the check was drawn, made payable to the company and forward the draft to it." In reference to the indorsement of checks made payable to the Union Credit Corporation, he was instructed to proceed to the bank on which they were drawn, indorse the check "Union Credit Corporation," secure a draft or drafts from such bank made payable to the former and turn the draft or drafts over to it.

Pickard had been employed as aforesaid "for quite an extended period" when he defaulted and absconded with approximately $4700 of the money of the Union Credit Corporation, including the proceeds of the five checks in controversy in this proceeding. It would appear that plaintiff was Pickard's bondsman and, having made Pickard's defalcations good to the Union Credit Corporation, took an assignment of its claim against the bank.

When Pickard received the checks from the Noland Motor Company he proceeded to the bank and indorsed them in the name of the Union Credit Corporation, but instead of procuring drafts for them or their proceeds in favor of his employer, he procured the

cash and did not turn the same over to it. Relative to the cashing of these checks by the bank, the cashier of the bank testified that Pickard was brought to the bank by Noland, who introduced him as the representative and collector of the Union Credit Corporation, with authority from it to receive cash upon checks drawn by Noland in favor of that company. Noland told the cashier that Pickard had been "instructed to get the cash." The checks in controversy were not the only ones made by Noland to the Union Credit Corporation. About eighty per cent of the total number made to that company were delivered by Noland to Pickard.

The decision in this case turns upon the question of the authority of Pickard to indorse the checks in question in the name of the Union Credit Corporation and receive the cash thereon from the defendant bank. His express authority was to indorse the checks in the name of the Union Credit Corporation and procure therefor drafts made payable to it and to turn such drafts over to his employer and, therefore, he had no express authority to get cash on the checks. But he did have express authority to make, in form, a general indorsement. There is no question but that the indorsements involved here were not forged. There was no restriction upon the manner in which Pickard should make the indorsement and, in fact, he indorsed the checks in controversy in accordance with his instructions. If he had indorsed the checks as he did and purchased drafts in the name of the Union Credit Corporation he would have followed the letter of his instructions. But after he indorsed the checks, as he was directed to do, he departed from his instructions with respect to purchasing the drafts, and procured the money on the checks and kept it. While the Union Credit Corporation granted full authority to Pickard to indorse checks in its name without any restrictive words, it restricted the use which he should make of the checks after he had indorsed them by requiring him to procure drafts for them to its order. Any departure by Pickard from his authority and instructions, in the absence of something to bring to the bank notice of his restricted authority, was a mere diversion of the checks from their authorized use, in which case the loss must fall upon his principal, the Union Credit Corporation, whose agent was guilty of the diversion, rather than on one who had no knowledge that Pickard intended to commit a fraud. [Cluett v. Couture, 125 N. Y. S. 814, 815, 816; McCabe Hanger Mfg. Co. v. Chelsea Exchange Bank, 170 N. Y. S. 759; Southern Real Estate Co. v. Strub, 97 Atl. 705, 708, 709; Wedge Mines Co. v. Denver Nat'l. Bank, 73 Pac. 873 (note).]

We have examined the cases cited by plaintiff, including Schmidt v. Garfield National Bank, 19 N. Y. S. 252; Exchange Bank v. Thrower, 45 S. W. (2d) (Ga.), and find that in these cases the form of the indorsement authority was restricted. Consequently, the conferring

of authority to make such indorsement did not confer authority to make a general indorsement. Here the authority was to make, in form, a general indorsement. These cases are distinguished in 12 A. L. R., pp. 117, 118. In the case of Wagner Trading Co. v. Battery National Bank, 228 N. Y. 37, cited by plaintiff, the president of the Wagner Company had authority to indorse checks in a form that was general, but he was restricted to indorsing them for the purposes of the company's business only and not for the purpose of transferring them to himself personally, or for his personal use. He indorsed the name of the Wagner Company on checks made to it, but he deposited the checks in his bank and to his own account, which was a different bank than that with which company did business. The court said, l. c. 43: "The nature of this transaction was such as to warn defendant that the checks were being diverted from usual business channels."

In the case at bar there was nothing to warn the bank that Pickard was diverting these funds to a purpose not authorized by his employer. He did not deposit checks made out to his employer to his own account but obtained cash upon them and there was nothing about the transaction to indicate to the bank that the money was not to be sent to his employer or used by Pickard in his employer's business.

However, it is insisted that the bank was in no way deceived by the transaction and that it should have inquired from a proper source as to Pickard's authority. In this connection it is properly stated that Noland had no authority to bind the Union Credit Corporation by representations made to the cashier of the bank. It is contended that the bank could not have been deceived because it had no information whatever from a competent source what Pickard's authority was and Pickard had no apparent authority to do what he did. It is not a question what knowledge the bank had. It is admitted that Pickard had authority to indorse these checks in the manner he did. There was nothing to put the bank upon inquiry as to Pickard's authority after he indorsed the checks.

This is merely a case where an agent used his authority to make an indorsement, general in form, to defraud his principal. This brings into play the doctrine that where one of two innocent persons must suffer by the acts of a third person, he who has enabled such third person to occasion the loss must sustain it. [National Safe Dep. Co. v. Hibbs, 229 U. S. 391.] What was said by the Supreme Court in Edwards v. Thomas, 66 Mo. 468, 488, in quoting approvingly from another case is applicable here.

" 'Seeing somebody must be a loser by this deceit, it is more reasonable that he that employs and puts confidence into the deceiver should be a loser than a stranger.' " [Hern v. Nichols, 1 Salk. 289.]

[See, also, Cluett v. Couture, supra, l. c. 817.] The judgment is affirmed. All concur.