ROBERT GORDON, Inc., v. INGERSOLL–RAND CO.

No. 7407.

Circuit Court of Appeals, Seventh Circuit.

Feb. 10, 1941.

R. C. Stevenson, of Chicago, Ill., for appellant.

Edgar A. Jonas and Frederick C. Jonas, both of Chicago, Ill., for appellee.

Before SPARKS and KERNER, Circuit Judges, and BALTZELL, District Judge.

KERNER, Circuit Judge.

Robert Gordon, Inc., of Illinois sued the Ingersoll-Rand Company of New Jersey for breach of contract to deliver certain machinery under a contract of sale. The defendant denied the making of the contract, the case was tried without a jury, and the District Court found for the plaintiff in the sum of $11,863.02. The Court entered judgment thereon and the defendant appeals.

A statement of the evidence which resolves conflicts therein in plaintiff's favor, is as follows:

Ingersoll-Rand manufactured and sold refrigeration or air-conditioning equipment, and one of its competitors in this business was the Carrier Company. Robert Gordon, Inc., was a contractor engaged in the business of buying and installing heating, ventilating and air-conditioning equipment in buildings, and one of its competitors was the Mehring & Hanson Company. These four companies knew that the University of Illinois had asked for bids from contractors for the construction of a new building on its Urbana campus to be known as Gregory Hall. They were also completely familiar with the specifications for the heating, ventilating and air-conditioning of Gregory Hall. These specifications expressly required the installation of Ingersoll-Rand or Carrier refrigeration machinery.

Roughly the specifications for Gregory Hall called for a base bid which comprised the costs of installing heating, ventilating and air-conditioning machinery. The cost of installing air-conditioning equipment included in the base bid covered two machines with auxiliaries, each machine capable of producing 175 tons of refrigeration. In addition, in connection with the cost of installing air-conditioning machinery contractors were required to submit three alternative bids which constituted a series of cumulative deductions from the base bid. The first alternative bid called for the omission from the base bid of the cost of installing one machine with its auxiliaries. The second alternative bid called for the omission from the base bid of the cost of installing the two machines with their auxiliaries, and for the addition to the base bid of the cost of installing a half-capacity machine producing 88 tons of refrigeration plus auxiliaries. The third alternative bid called for the omission from the base bid of all refrigeration machinery and apparatus.

For many years Robert Gordon, Inc., had engaged in the heating and ventilating contracting business, performing contracts in many large buildings in Chicago, Illinois, including the heating and air-conditioning of the Field Building. To Brayton, its experienced engineer, was assigned the important task of preparing estimates preparatory to submitting bids on various contracts. To prepare an estimate, Brayton would procure quotations and descriptions from manufacturers on machinery required by the plans and specifications, analyze and compare the competitive quotations, compile and tabulate the matter, and submit it to Hoier (president of Robert Gordon, Inc.) for approval. For the Gregory Hall contract Brayton received quotations from Ingersoll-Rand and Carrier, and Hoier compared these quotations prior to the approval of Brayton's estimate. On the other hand Ingersoll-Rand was in possession of the plans and specifications for the Gregory Hall project and consequently was in position to quote accurate prices and to describe reliably the necessary refrigerator equipment.

On December 23, 1938, defendant received telephone calls at its Chicago office from Robert Gordon, Inc., and from Mehring and Hanson. These two contractors requested a quotation of prices for the refrigeration machinery designated in the plans and specifications for Gregory Hall and a confirmation thereof in writing. On that day, and pursuant to the telephonic conversations, Armstrong (defendant's office engineer) posted its letter of December 23, 1938, and he knew at that time that the two contractors would rely on the accuracy of the prices quoted therein. One addressee received the original copy of defendant's letter and the other

one received the carbon copy. This letter of December 23, 1938, consisting of two typewritten pages, is contained substantially in the footnote.[1] At the bottom of the first page of the letter there appeared in small red type the following printed matter: "All agreements contingent upon strikes, accidents and other conditions beyond our control. All contracts are subject to approval by an officer of the company. Quotations subject to change without notice."

The letter of December 23 was received by the addressees on December 24, 1938. Upon receipt thereof Dickerson of Mehring and Hanson telephoned Armstrong that in his opinion the letter was vague and that he wanted clarification on the prices quoted therein. Armstrong informed him that the price in each column was for one machine, and Dickerson then suggested that Armstrong send out another letter to contractors clarifying the letter of December 23, 1938. Dickerson also stated that "there was some confusion in my mind as to what it [the letter] meant. I thought from the letter and my first impression was that the price of $26,450 under item 1 * * * referred to two machines, but from my knowledge of prices I knew that there was some-

thing screwy about that. That is why I called up * * * we are constantly bidding on jobs of this type and have a general overall knowledge· of prices for these machines on a total basis that we use for a rough check."

When Robert Gordon, Inc., received the letter of December 23, 1938, it used the figure of $26,450 therein as the price for two full-capacity machines (plus auxiliaries), compared this price of $26,450 with the Carrier Company price of $37,000, and accepted the lower figure in preparing its bid for the Gregory Hall contract. As to the letter of December 23, 1938, Brayton testified that "I thought that I would get two 175-ton machines for $26,450 * * * I thought I could get a half capacity 88-ton machine for the difference between $26,450 and the $18,000 [$18,410] price. * * * I thought the figure $18,-410 * * * was the price for one full capacity machine of 175-tons and a half capacity machine which it was stipulated was included in that quotation." In this connection Hoier testified that "when I figured the price under Alternate No. 1 for a 175-ton machine, I figured on half of the price * * * that was stated in the bottom of column 1 * * *, half of $26,450. * * * I calculated that I

---

[1] Gentlemen: In accordance with our telephone conversation, we tabulate below the vital information for making the necessary quotation for centrifugal vacuum refrigeration to be used in the air conditioning of Gregory Hall. The tabulation includes two machines as listed under Item 1. The alternate bid includes one of these machines, and the second alternate includes the half capacity machine listed under Item 2.

| | Item 1 | Item 2 |
|---|---|---|
| Machine Frame | 2-M-4 | 1-M-4 |
| Tons of Refrigeration | 175 | 88 |
| Chilled Water Temperature | 45° F. | 45° F. |
| Return Water Temperature | 56° F. | 56° F. |
| Chilled Water, GPM | 380 | 190 |
| Condensing Water, In | 95 | 95 |
| Condensing Water, Out | 113.5 | 113.5 |
| GPM of Condensing Water | 1200 | 600 |
| GPM of City Water to diaphragms of Machine | 30 | 20 |
| Friction Through Both Condensers | 52' | 26.3' |
| Brake Horsepower | 203 | 102 |
| Steam Pressure | 1# | 1# |
| Turbine Condenser Vacuum | 25" | 25" |
| Steam Consumption | 7,300#/hr. | 3,650#/hr. |
| PRICE | $26,450.00 | $18,410.00 |
| Approximate Shipping Weight | 47,200# | 32,400# |
| Approximate Dimensions—Print | 345-E-3 | 208-E-3 |

Prices are f.o.b. Phillipsburg, New Jersey, with freight allowed to Urbana, Illinois, and include the standard water vapor·refrigeration unit, consisting of turbine, compressor, vapor condenser, evaporator, hot well pump, and chilled water pump; a turbine condenser with booster with rotary dry vacuum pump, and hot well pump. We also include the supervision of erection of the equipment.

In order to give you some idea of the type of turbine vapor condenser which would be supplied, we attach a copy of our Drawing 431-D-3, covering similar unit.

We trust you will find the information we have given you complete for making this rush quotation, and wish to assure you that we would be pleased to supply any additional details.

Very truly yours,

Ingersoll-Rand Company

could buy a half-capacity machine for one-quarter of $26,450. * * * I looked at column 2 * * * and saw the price at the bottom. That price is for one and a half machine, $18,410."

On December 27, 1938, the plaintiff filed with the University of Illinois its base bid[2] of $169,561 for the cost of installing the heating, ventilating and air-conditioning machinery in Gregory Hall, together with its bid bond of $10,000. On December 28, 1938, the University of Illinois accepted this bid and on the same day notified plaintiff of the acceptance. On December 29, 1938, Hoier visited Lewis, consulting mechanical engineer for the University of Illinois, at the latter's Chicago office and showed him the Ingersoll-Rand letter of December 23, 1938. Hoier told Lewis that if Ingersoll-Rand refused to sell two machines for $26,450, then he would sue for breach of contract. Lewis expressed the thought that the letter of December 23 could not be understood to mean the sale of two machines for $26,450, and that if Hoier had used that basis he had made a mistake and he "had better get out of that bid." Lewis also stated that although he had no power to release plaintiff from its bid, he "would be glad to help him get his bid out because * * * [he] did not think the University of Illinois wanted to take advantage of a man who had made an obvious mistake in preparing his bid." Hoier answered that this would not be a proper thing to do and that moreover it might injure his reputation as a bidder.

In response to questions put by the Court, Lewis testified that the reason he told Hoier the $26,450 figure covered only one unit in his opinion was because "the price was so absurdly low" for two units producing 350 tons of refrigeration, and that his opinion was based upon his intimate knowledge of refrigeration of this type and from his experience in preparing specifications for such machinery. On cross-examination Lewis added that "I would say that the information that I have concerning this machinery would be common to Robert Gordon, Inc. They would certainly know it also * * * they would know particularly the construction of such machinery in its final detail. Robert Gordon, Inc., has purchased machinery of this kind and has installed it in many large buildings. * * * I know of no instance where they used * * * centrifugal vacuum refrigeration. I do not think it is quite possible that they would not know."

It also appears that on the same day, December 29, 1938, Hoier telephoned Johnson (defendant's Chicago office manager), advised him that Robert Gordon, Inc., was the low bidder for the Gregory Hall work at Urbana, and requested him to send "eight copies of all bids, equipment and diagrams, so as to be ready to submit them with the rest of the equipment for that job as quickly as possible. * * * Mr. Johnson said he would look it up right away." On December 30, 1938 another telephone conversation occurred, this time between Hoier and Dickerson (Mehring and Hanson), in which they compared their bids to determine where the variance lay. Hoier told Dickerson that he had used a refrigeration figure of $26,450, to which Dickerson answered that "Well, there is your mistake * * *, there is the variance in the bids." Dickerson then informed Hoier as to the Armstrong-Dickerson conversation of December 24, 1938.

On December 31, 1938, Hoier sent a letter to Ingersoll-Rand stating that it accepted the proposition outlined in the letter of December 23 "to furnish the machines as tabulated in item No. 1" at the price of $26,450 "quoted to include the two machines." On January 3, 1939, Johnson visited Hoier's office and informed him that Hoier had misconstrued the data contained in the letter of December 23, that the letter of December 23 was not an offer and that it quoted the price of $26,450 for one machine. On January 7, 1939, defendant by letter rejected plaintiff's letter of December 31, 1938, and therein proposed to consider plaintiff's order for two 175-ton machines at $52,900. On January 11,

[2] The bid schedule for the Gregory Hall contract, showing the two lowest bidders, is as follows:

| Bidders | Base Bid | Alternate #1 | Proposals #2 | (Deduct) #3 |
|---|---|---|---|---|
| Robert Gordon, Inc. | $169,561. | $18,000. | $14,000. | $44,000. |
| Mehring and Hanson | 183,956. | 29,420. | 16,200. | 30,829. |

(Alternate #1—Omit one full-capacity machine; alternate #2—omit the two full-capacity machines included in base bid and install one half-capacity machine; and alternate #3—omit all refrigeration.)

1939, the plaintiff wrote, claiming the letters of December 23 and December 31 constituted a contract with defendant on the basis of two machines for $26,450. As the defendant persisted in declining to recognize the existence of a contract, the plaintiff sued it for breach of contract.

At the trial plaintiff adduced evidence through contractors Hoier and Berry tending to show a certain usage at the time of the acts described above. Hoier testified that there was a usage in the contracting trade that when contractors received price quotations from manufacturers of equipment required for work the contractors were bidding on, such quotations were accepted by the contracting trade as offers to sell equipment at the quoted prices. Berry testified that the "custom was to ask material dealers and manufacturers for quotations * * * and those quotations were considered firm prices that you could use * * *. If you were successful in securing the work, these proposals were considered to be the prices for which the material could be purchased." On cross-examination Berry observed that contractors do not always buy from manufacturers whose prices they used in making up their bids and that they try to get the best price from the manufacturer. He added that "after we get the award [in a case similar to the one at bar], we send in an order to the manufacturer for that material we have to furnish. Then the manufacturer accepts the order. Our order is based on the proposal made by the manufacturer." He then stated that "It is true in some cases and in some cases it is not, that there is a period of negotiation between the time we have made our bid to the job and the time we send in an order and we ask for and get a better price. * * *. On public work it is different from private work. In our office after * * * we are successful in getting the award for the job, we do not go about determining where we can get the material that is suitable for the job at the best price. I have heard that it is sometimes done in other offices. I have no direct knowledge. They tell me that an order is usually given to the manufacturer from whom the contractor can make the best deal. I have no personal knowledge whether the manufacturer will then accept that order or not." In this connection the plaintiff also introduced another opinion witness, but we shall omit his testimony because it was considered of "doubtful" value by the District Court.

■ To recover in this case it was incumbent that plaintiff show (1) that the Ingersoll-Rand letter could be regarded reasonably as a promise to deliver machinery at the prices therein quoted, and (2) that a reasonable person in the position of the parties would have thought that the Ingersoll-Rand letter intended the price of $26,450 therein stated to refer to two units. In addition it was necessary (3) that it avoid the significance of the fact that it knew prior to the acceptance that the promisor meant the price of $26,450 to refer to one unit, and (4) that it escape the consequences of the red printed statement contained in the Ingersoll-Rand letter. The District Court concluded that the plaintiff had accomplished the task confronting it, but it is our thought in the matter that the Court erred in reaching this conclusion.

■ *The Offer to Sell.* To us it is clear that the language of the Ingersoll-Rand letter is not the language of an offeror, and indeed it stretches interpretation beyond propriety to conclude that the words used therein constituted an offer to sell certain machinery at the stated prices. Nor in our opinion do the circumstances surrounding the writing and sending of the letter compel a different result. It is well to keep in mind that at this time plaintiff was estimating the cost of installing Ingersoll-Rand or Carrier machinery in Gregory Hall. For this purpose it was necessary to procure the particular data and information which it did request of Ingersoll-Rand and Carrier. Later, after comparative analysis of the data received, it prepared its bid. Moreover, there was no certainty that plaintiff would be the successful bidder and subsequently a purchaser from defendant. These then were the circumstances surrounding the letter, and to them we do not ascribe any strange power to change the non-promissory language used by Ingersoll-Rand. Certainly the fact that the letter was relied upon for its accuracy did not convert a statement furnishing information into an offer of sale or into insurance against price changes. Neither did the plaintiff deem it essential on December 23, 1938, to ask defendant for a contract conditional upon the success of its bid; nor is it supposable that on that day Ingersoll-.

Rand thought it advantageous to bind itself as offeror.

Evidently something more was required to convert this informant into a promisor but we do not believe that the trade usage relied upon by plaintiff supplies the requisite. It is true that evidence was adduced tending to show that a quotation given by a manufacturer to a contractor for bid purposes was treated in the trade as an offer of sale. Yet we can not overlook Berry's testimony in this regard. His testimony weakened Hoier's presentation considerably, and added uncertainty and doubt as to the generality and uniformity of the usage. Furthermore the offer of sale was regarded as irrevocable from the moment the contractor submitted his bid until the contract award was granted and, if the contractor was successful, until a reasonable time thereafter had expired. We consider this usage strict and even onerous in character, for in effect it compels a manufacturer who merely desires to impart information to prospective customers, to exclude the operation of the usage in express terms.

 Ordinarily parties trading in a particular market are presumed to know the general or uniform usages prevailing in that market, and these usages enter into their agreements. Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 334 Ill. 281, 290, 165 N.E. 793. However, courts are less willing to assume that this knowledge or duty to know exists, where the evidence of usage is not entirely satisfactory. Especially is this true where the usage imposes an appreciable restraint on one of the tradesmen or carries with it possible business consequences of a severe nature.

We have already shown that the letter and spirit of the writing in question was strong indeed and all to the end that the writer thereof neither considered itself an offeror nor intended to bind itself as such. We have also expressed ourselves as to the character of the usage evidence and of the usage itself. We now observe that there is no evidence whatsoever that Ingersoll-Rand knew of or had adopted the usuage. We think that these circumstances warrant the conclusion that the writing and sending of the letter, and the acts related thereto, were not transacted with reference to the usage.

Counsel for plaintiff relies heavily on the applicability of the Sterling-Midland case, supra, to the facts of the instant case. On the other hand counsel for defendant argues that evidence of usage "will never be allowed to make a contract," and in support of his argument he cites Currie v. Syndicate, 104 Ill.App. 165; First National Bank v. Burkhardt, 100 U.S. 686, 25 L.Ed. 766, and Tilley v. Cook County, 103 U.S. 155, 26 L.Ed. 374. In the Currie case, 104 Ill.App. at page 171, the Court refused to allow evidence of usage "to show that a contract was actually made. In other words, the endeavor is to create a contract by usage; to prove its existence by proof of usage." In the Burkhardt case, 100 U.S. at page 692, 25 L.Ed. 766, the Court stated that a usage may be proved to remove "uncertainties in a contract, or to annex incidents, but it cannot * * * contradict * * * what is otherwise manifest. * * * Usage cannot make a contract where there is none." In the Tilley case, 103 U.S. at page 162, 26 L.Ed. 374, the Court repeated that "unless some contract is shown, evidence of usage * * * is immaterial." See, also, Sterling-Midland case, supra, 334 Ill. at page 290, 165 N.E. 793. We deem it unnecessary at this time to comment either on the applicability of the cases cited or on the matter quoted above. We have already concluded as to the effect of the usage evidence on the written instrument in question, and we need only say that the Sterling-Midland case has not been ignored in reaching our conclusion.

 *Ingersoll-Rand Letter.* Would a reasonable person in the position of the parties have thought that the letter in question intended the price of $26,450 to apply to two machinery units? Counsel for plaintiff lays great stress on two factors: (1) Hoier and Brayton believed that $26,450 was the price for two units; and (2) the second sentence in the letter was very significant and certainly so misleading as to tinge the entire instrument with ambiguity. Our consideration of the letter in its entirety and of the testimony relative thereto leads us to the conclusion that Hoier and Brayton could not have reasonably entertained the belief that two units could have been purchased at the price of $26,450.

The tabulation of data contained at the bottom of page one of the letter is unmistakably clear and complete to the reader and establishes a consistent relationship between machinery described and

prices stated therein. The descriptive matter of the tabulation relates to the machinery in the singular number, for example, "Machine Frame" and "GPM of City Water to diaphragms of Machine." In this connection the third sentence of the letter refers to "the half capacity machine listed under Item 2," and the fourth sentence of the letter also describes the auxiliary equipment going with "the standard water vapor refrigeration unit" in the singular number. Item 1 of the tabulation lists one full-capacity machine with its auxiliaries, states a price of $26,450 and gives a shipping weight therefor of 47,200 pounds. Item 2 of the tabulation lists one half-capacity machine with its auxiliaries, states a price of $18,410 and gives a shipping weight therefor of 32,400 pounds. In each instance the shipping weight bears a relation to the price of 56 cents per pound. This tabulation is complete and consistent with itself and it is plain that taken by itself it could not have misled Hoier and Brayton.

The third sentence of the letter in part stated that "the second alternate [bid] includes the half capacity machine listed under Item 2." In this regard alternate bid #2 was required by the Gregory Hall specifications to cover the sole cost of installing one half-capacity machine. Obviously this sentence could only mean that the description listed under Item 2 of the tabulation referred to a half-capacity machine and we believe it reasonably follows that the price listed under Item 2 also referred to a half-capacity machine. Although Hoier and Brayton could not state with reason that Item 2 of the tabulation referred to one full-capacity and one half-capacity machine, they testified to the belief that the price of $18,140 listed under Item 2 covered one full-capacity and one half-capacity machine. Of course, if the price of $18,140 was confined to one half-capacity machine, it would be difficult to conclude that $26,450 would purchase two full-capacity machines.

The second sentence, underscored by plaintiff and the District Court, states that the tabulation "includes two machines as listed under Item 1." Yet neither the descriptive matter of the tabulation nor the data listed under Item 1 of the tabulation refer to two machines. In fact the third sentence, the tabulation itself and the fourth sentence lead inevitably to the conclusion that the description and price of $26,450 listed under Item 1 refer to one full-capacity machine. Certainly when the second sentence is read in its context, it fails to display the force which counsel has ascribed to it and which it may appear to have in its free state. At least it is supposable that by this obvious conflict the reader was warned againt a mistake of the writer.

Nor do we overlook the fact that Robert Gordon, Inc., had before it for comparative purposes the Carrier price of $37,000, and that it represented one of the most experienced and oldest contracting firms in the business of purchasing and installing refrigerator machinery. In this connection we think that the testimony of Lewis and Dickerson is pertinent and reliable beyond question. Lewis stated in effect that an experienced contractor such as plaintiff had reason to know that the price of $26,450 for two machines was "absurdly low." Dickerson testified that his "knowledge of prices" indicated that a price of $26,450 was too good to be true, and that his experience as a contractor in this field served him as a warning against a mistake of the writer. As he put it, "we are constantly bidding on jobs of this type and have a general overall knowledge of prices for these machines on a total basis that we use for a rough check." It is our conclusion that plaintiff could not have reasonably entertained the belief that the Ingersoll-Rand letter intended the price of $26,450 to refer to two full-capacity machines.

*Promissory Estoppel.* Let us assume that plaintiff had proved (1) that the Ingersoll-Rand letter constituted an offer made under mistake or one which had failed to express what the writer had intended, and (2) that the plaintiff had reasonably understood the offer to be one to deliver two machines for $26,450. Plainly acceptance of this offer would have created an enforcible contract. However, prior to this acceptance plaintiff had learned with certainty that $26,450 was the price for one machine. Ordinarily under these circumstances the acceptor would not be allowed to enforce the offer as he originally understood it. But counsel argues that the promisee's reliance in its bid, which later was accepted, had "unalterably changed" its position and that therefore defendant should be bound by

661

its proposal so as to prevent obvious injustice. Counsel cites Section 90 of the Restatement of Contracts.

Generally the doctrine of promissory estoppel has been applied in the charitable subscription cases and in cases where the promise enforced has been non-commercial in character. Courts have not been as generous in applying the doctrine to commercial transactions. See James Baird Co. v. Gimbel Bros., 2 Cir., 64 F.2d 344. In the Baird case the Court refused to apply promissory estoppel to enforce a promise in a commercial transaction similar in nature to the instant transaction. Unquestionably the Baird case is in point, for we fail to differentiate between the revocation of the offer in that case and the effect in this case of knowledge on the offer as originally understood. However we choose not to follow the Baird case. The mere fact that the transaction is commercial in nature should not preclude the use of the promissory estoppel. But even so, the doctrine may not be invoked here. Justifiable reliance and irreparable detriment to the promisee are requisite factors among others. In the instant case the promisee has failed to show irreparable detriment. See testimony of Lewis, and case-law which relieves contractors from consequences of erroneous bids, Bromagin & Co. v. City of Bloomington, 234 Ill. 114, 84 N.E. 700.

*Small Red Type.* At the bottom of the first page of the Ingersoll-Rand letter appeared the following printed statement: "All contracts are subject to approval by an officer of the Company. Quotations subject to change without notice." This printed matter was in small red type, removed somewhat from the body of the letter and not referred to therein, and not as easily readable as the typewritten matter. In our discussion of the points on appeal we have not regarded the printed matter as part of the Ingersoll-Rand letter.

The judgment is reversed.

SPARKS, Circuit Judge (concurring).

I approve this opinion with the exception of the last paragraph, which deals with that part of the letter in red type. The letter covers one page and a half. The quotation of prices ends very near the bottom of the first page. Immediately following this, at the bottom of the same page, is the red type matter. In my judgment it is not removed somewhat from the body of the letter, but is contained therein, for the remaining part of the letter follows immediately on the next page. True, the portion in red is not printed with letters so large as the typewritten portion, but it is just as plain and as easily readable.

There is no intimation or indication in this record that the red type was used for decorative purposes, but, as customary, I think it was used to call especial attention to the fact that the quotations were subject to change without notice and that they would not constitute a binding contract until approved by an officer of the company. That is precisely what the red portion states, and it is placed in the middle of the letter. I regard the red printing as a part of the letter, and I think it constitutes a very potent additional reason why the judgment should be reversed.