**THOS. J. SHEEHAN CO., a Corporation, Appellant,**

v.

**CRANE COMPANY, a Corporation, Appellee.**

**No. 19495.**

United States Court of Appeals Eighth Circuit.

Nov. 19, 1969.

Rehearing Denied Dec. 23, 1969.

Ward Fickie, of Biggs, Hensley, Curtis & Biggs, St. Louis, Mo., for appellant.

P. Terence Crebs, of Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for appellee; G. Carroll Stribling, Jr., St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and LAY and HEANEY, Circuit Judges.

LAY, Circuit Judge.

Recovery is sought against the defendant Crane Company for alleged excess charges paid for plumbing supplies used by the plaintiff, Thos. J. Sheehan Co., as a subcontractor, on a large apartment project in St. Louis, Missouri. The plaintiff claims that it had an enforceable contract with the defendant for the supply of copper tubing and pipe at a certain guaranteed price. Thos. J. Sheehan Co. issued a purchase order based on the price quoted by the defendant. Crane Company rejected the purchase order, but asked a new price reflecting a smaller discount than originally quoted. It was ultimately agreed by the plaintiff that the defendant would ship the supplies under the new discount. Plaintiff paid for the supplies under the new pricing schedules as they were delivered. Plaintiff contended in the trial court, as well as here, that the payments in excess of the original price schedule were made under economic duress and should be returned.

The facts and issues were presented to the court without a jury. The trial judge found in favor of the defendant holding that there existed no enforceable contract between the parties based on the original quotation, and additionally held there was insufficient evidence as a matter of law to constitute economic coercion. Although for different reasons, we affirm the judgment for the defendant.

Plaintiff was a successful bidder on the plumbing work for an apartment development called the Mansion House Project. Moran-Turner was the general contractor. Plaintiff, in anticipation of its bid with Moran-Turner, obtained a written price quotation from the defendant on May 8, 1963, regarding various supplies, including copper tubing and copper pipe. The written quotation was in response to plaintiff's general inquiry and it revealed that price protection would be given to shipments of "copper tubing" from May 1, 1963 to May 1, 1964. The May 8 letter from Crane Company recited that "copper fittings" were to be protected for the "duration of the job." Thereafter plaintiff rendered its bid estimate on the work to Moran-Turner. At the trial Sheehan Co. did not recall whether the price of materials included in its bid was actually based upon defendant's price schedule or the list of some other supplier who may have furnished price quotations to the plaintiff for the copper involved. On August 6, 1963, the general contractor gave plaintiff its "letter of intent" which indicated that plaintiff was the successful bidder and would be given the subcontract for the work. However, the general contractor reserved the right to withdraw from the contract any time before formal signing. The actual subcontract between the Thos. J. Sheehan Co. and Moran-Turner itself was not formally executed until August of 1964.

In November of 1963 defendant's manager, Albert Lesker, informed plaintiff that a more favorable discount could be provided on copper than had previously been submitted. This new price was based upon the so-called "Chase Sheet" which was dated Sept. 23, 1969. This was a typical mill price sheet fur-

nished distributors such as Crane Company by the manufacturers of copper pipe and tubing. Defendant asserts that shipments under the new price sheet were to be protected for only one year, until November of 1964. The trial court so found. Plaintiff, on the other hand, asserts that this finding was in error. Plaintiff asserts that the only evidence in the record is that the prices on the "Chase Sheet" were to be protected for "the duration of the job." The evidence shows that in July of 1964 Sheehan Co. orally communicated to the Crane Company that it was going to give defendant the order. However, it was not until January of 1965 that plaintiff actually submitted its first purchase orders to the defendant, the price reflecting the September 1963 "Chase Sheet" quotations. Crane Company then announced that it could no longer deliver the copper at the prices set forth on the purchase order.

Plaintiff then agreed to take the supplies at a smaller discount since there was a shortage of copper on the market, and the new price offered was less than the price available on the open market. Furthermore, plaintiff needed immediate shipment of the supplies in order to perform on its contract with Moran-Turner.

The Sheehan Co. paid for the shipments made by the Crane Company. However, the final payment of $30,000 was withheld in an attempt to negotiate the alleged excess charges for the copper. Because of this action, defendant served a "Notice of Intention to File a Mechanic's Lien" on Moran-Turner. The plaintiff had a contract provision with Moran-Turner which stated that plaintiff would not allow any mechanic's liens to be filed against the general contractor. Rather than be in violation of its agreement with the contractor, the Sheehan Co. ultimately made the $30,000 payment. It is the filing of this "Notice" as well as the alleged coercive conduct centering around defendant's refusal to ship under the September 1963 price sheet which plaintiff asserts as economic duress.

We fail to find that plaintiff and defendant at any time entered into an enforceable contract to sell and buy the copper at the September 1963 price. In view of this holding we need not discuss the secondary issue of economic duress.

■ We find no evidence to support the trial court's finding that the price protection on the September 1963 quotation extended only until November 1964. Mr. Lesker testified that the "Chase" quotations were, "as far as he recalled" based upon the information received from the manufacturer, and were in fact for "the duration of the job." The information shown to be available to Lesker at the time, as communicated by the manufacturer to the defendant Crane Company, demonstrates that Lesker was in error and that the prices were to be protected only until November 1964. However, the evidence is uncontradicted that this fact was never communicated to the Thos. J. Sheehan Co. The Thos. J. Sheehan Co. cannot be charged with defendant's knowledge.

Plaintiff further argues that the trial court's finding that there existed no contract as a result of the May 8, 1963, price sheet and letter from Crane Company to Sheehan Co. is in error. Plaintiff asserts that its claim is not based upon this letter but rather the oral "offer" made in September of 1963, reflecting a totally new proposal and agreement with price protection for the duration of the project. To the extent that the trial court erred in stating the dates of the alleged offer, defendant agrees.

■ However, we see no necessity to remand the case for further findings. We find as a matter of law that an enforceable agreement did not exist between the parties at any time based upon the "Chase Sheet" prices of September 1963. In order to hold that the parties entered into a contract to buy and sell at the September 1963 prices, there must be evidence of an offer by

Crane Company inviting an acceptance at those prices. Such an offer must have manifested a present intention of a promise to sell to the Sheehan Co. at the prices indicated. We think it clear that the Crane Company's oral quotation of September 1963 manifested only a future intention to sell and thereby its quotation constituted only an invitation to plaintiff to make an offer. The oral quotation lacked the definiteness required under basic principles of contract law in order to constitute an offer. The only evidence of defendant's alleged September 1963 offer is the oral communication to plaintiff that Crane Company could supply copper for the Mansion House Project at a lower price than originally quoted. Reference was made to the new "Chase" price sheet concerning deliveries in minimum quantities of 5000 pounds or 5000 feet, and that prices for copper would be guaranteed for "the duration of the job." At this time nothing was stated by the defendant or plaintiff as to (1) the time in which plaintiff had to accept the "offer," (2) the quantity of copper tubing, fittings, or other supplies to be ordered, (3) the terms of payment or (4) the time when Crane Company promised to perform.

On the price sheets attached to the May 8, 1963, letter, it was stated: "all prices subject to change without notice." The duration of price protection mentioned in the letter itself demonstrates that the parties' reference to "price protection" was unrelated to any time in which the price listed on the sheets was to be held open for acceptance. As used "price protection" related to the price of the copper supplies once a contract to supply had been consummated. The "Chase" price sheet was nothing more than a circular sent to distributors by the manufacturer, Wolverine. Without other terms of commitment, we find that the proposal as to "price protection" was related only to the quoted price as a condition upon which the supplier would be willing *in the future* to negotiate a contract of shipment.

It might be argued that some of these terms missing from the September proposal were set forth in the Crane Company letter of May 8, 1963. However, plaintiff rejects the May 8th letter as being material to the contract it sued upon. Plaintiff argues that the terms of the contract sued upon were orally communicated in September of 1963. There is no contention made that the various terms of the May 8 letter and September telephone call were integrated as a single offer. Furthermore, this approach would then add total confusion as to the indefiniteness of the offer itself. It is difficult to reason that defendant considered its quotation to be a definite offer in May 1963. At that time plaintiff had not been awarded any contract; defendant knew its price list was submitted not as a bid on a contract, but to enable plaintiff to compute an estimate bid by comparing various price lists. The evidence shows that other price lists were obtained from other suppliers. There is no indication that defendant submitted its quotation as an offer to be accepted within any period of time. Both parties knew they were dealing with goods having a fluctuating value. The price list attached in May 1963 alerted plaintiff that the prices themselves were subject to change without notice.

Prices and price factors quoted by suppliers to contractors for the purposes of aiding contractors to make bid estimates, without more specific terms, do not obligate the supplier to comply with any purchase order upon whatever terms and conditions the contractor may choose to offer at some undetermined date in the future. The fact that the prices quoted are not withdrawn or that a withdrawal of them is not communicated to the contractor is immaterial. No duty exists to revoke terms which without words of commitment merely quote an existing price at

which a contract of purchase might be negotiated.

It is axiomatic that an enforceable contract requires a meeting of the minds of the parties and a mutuality of obligation. It is clear that at the time of defendant's written purchase order neither of these existed. Defendant's oral communication of September 1963 merely quoted prices preliminary to entering into an actual contract of sale.

It has been authoritatively stated:

"[I]f goods are advertised for sale at a certain price, it is not an offer, and no contract is formed by the statement of an intending purchaser that he will take a specified quantity of the goods at that price. The construction is rather favored that such an advertisement is a mere invitation to enter into a bargain rather than an offer. So *a published price list is not an offer to sell the goods listed at the published prices. Even where the parties are dealing exclusively with one another by private letters or telegrams, or by oral conversation, the same question may arise; and language that at first sight may seem an offer may be found merely preliminary in its character."* (Emphasis ours.) 1 Williston, Contracts § 27, p. 62 (3d ed. 1957).

See e. g., Robert Gordon, Inc. v. Ingersoll-Rand Co., 117 F.2d 654 (7 Cir.1941) (price list submitted to bidder held not a promissory offer).

Missouri law is in accord with the general legal principles we have discussed. See Buckberg v. Washburn-Crosby Co., 115 Mo.App. 701, 92 S.W. 733 (1906); Missouri ex rel. and to Use of Detroit Steel Products Co. v. Childers, 48 F.Supp. 642 (W.D.Mo.1942); *cf.* Sharp Bros. Contracting Co. v. Commercial Restoration, Inc., 334 S.W.2d 248 (Mo.App.1960); Thacker v. Massman Const. Co., 247 S.W.2d 623, 629–630 (Mo.1952). See also Restatement of Contracts § 25, comment *a* (1932); Simpson, Law of Contracts §§ 15–16 (2d ed. 1965).