**DEBRON CORPORATION, Appellant,**

v.

**NATIONAL HOMES CONSTRUCTION CORPORATION, Appellee.**

No. 73–1504.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1974.

Decided March 13, 1974.

Rehearing and Rehearing En Banc Denied April 3, 1974.

Samuel C. Ebling, John B. Lewis, St. Louis, Mo., for appellant.

Albert E. Schoenbeck, St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

Debron Corporation appeals from the district court's grant of a judgment notwithstanding the verdict after a jury awarded it damages against National Homes Construction Corporation, arising from the latter's failure to perform as a subcontractor. National Homes Construction Corporation, a steel erector, was the only subcontractor to submit a bid to the Debron Corporation, a general contractor, for the steel erection of a building in Buffalo, New York. Debron used that bid as part of its total bid with the owner for the main construction project. After Debron was awarded the main contract, National Homes withdrew its bid. National Homes did not perform and Debron was required to obtain performance of the subcontract from a third party at an increased cost. Before trial, Debron voluntarily dismissed its count for breach of contract and submitted its proof solely on the theory of promissory estoppel,

*i. e.*, that it justifiably relied to its detriment on the subcontractor's bid and therefore National Homes was obligated to perform. The trial court submitted the case to a jury and a verdict was returned in favor of Debron in the amount of $97,691. The trial court granted a judgment notwithstanding the verdict in favor of National Homes, holding that Debron had substantially changed the terms of the offer originally made by National Homes, and that the doctrine of promissory estoppel did not apply because the plaintiff failed to meet its burden of proof that it had relied upon the original quotation submitted. We reverse and remand the case with directions to reinstate the verdict.

*Facts*

Debron is engaged in the steel fabrication business. In the latter part of 1970, Debron decided to submit a bid to the New York State University Construction Fund on the fabrication and erection of the structural steel for the new medical science building of the State University of New York at Buffalo. Accordingly, in order to prepare its own bid, Debron sought estimates from several steel erectors. National Homes was the only steel erector to express interest in the project.

In December, 1970, Jim Orr, Vice President and General Manager of the Steel Erectors Division of National Homes, requested Debron to send him the plans and specifications for the Buffalo job so that he could prepare an estimate. These plans were sent to Orr on December 22, 1970.

On January 7, 1971, Orr traveled to the Debron plant in St. Louis to review the plans for the Buffalo job with Debron personnel. On January 11, 1971, Orr telephoned Mr. Muehlenbrock of Debron to submit a unit price bid on the erection of the structural steel and steel deck for the Buffalo job. The basic price of Orr's bid was $128 per ton for the erection of the structural steel and $14 per hundred square feet for the steel deck. Muehlenbrock made a con-

temporaneous notation of the substance of the phone call. Orr did not at any time reduce his bid to writing; however, Orr's files contained an estimate sheet in his own handwriting which conformed to Muehlenbrock's notes. Orr's estimate sheet read in part as follows:

"Bid price of $128 per ton was accepted with the provision that we furnish bond and possibly make an allowance for steel delivered to the job site."

"Total tonnage 3,700 @ $128 per ton    473,600
Decking 1572 squares @ $14              22,008
Total job approx.                      495,608"

It was orally agreed by both parties at the time of the January 11 phone call that Debron would use National Homes' bid in the preparation of Debron's own bid and that if Debron were awarded the main contract, it would use National Homes as its steel erection subcontractor.

Debron thereafter submitted its overall bid to the Construction Fund. According to Debron, the difference in the steel erection price submitted by Orr, $495,608, and that submitted by Debron to the Construction Fund, $519,080, reflects only the standard profit mark-up customarily applied by a general contractor.

On January 13, 1971, Debron was declared the low bidder. Immediately after learning that he was the low bidder, Muehlenbrock advised Orr of that fact. On January 15, 1971, Muehlenbrock advised the Construction Fund that National Homes would be Debron's steel erection subcontractor.

Shortly thereafter Orr met with Muehlenbrock in Buffalo to review plans for coordination of the job between Debron and National Homes. At this conference, Orr reaffirmed National Homes' bid as made by telephone on January 11, 1971. The parties then met with the construction Fund where Orr was introduced as Debron's subcontractor for the steel erection job. Orr testified that he attended the meeting because he thought he was the subcontractor on the job and all subcontractors had to be approved by the Construction Fund. Orr told his supervisor, Mr. Bur-

ton, Executive Vice President of National Homes, that he was attending the meeting in Buffalo and subsequently furnished Burton with a copy of the minutes of the meeting for Burton's files.

On February 1, 1971, Orr notified Debron that National Homes had been approved under the Buffalo plan as an equal opportunity employer, as required by the Construction Fund.

During late January and early February, Debron personnel communicated with Orr by telephone several times to discuss details of the job. On February 8, 1971, Orr went to the Debron plant in St. Louis to review further details. At that time, according to Debron's evidence, Orr and Debron agreed that even though the original specifications called for the work to begin on May 1, 1971, the actual erection of the steel need not start before July 1, 1971, because the job would only require fourteen weeks and did not need to be completed before November 1.

During February, March and April, Debron placed orders with steel mills for the furnishing of the steel. During this time period, Debron also forwarded to Orr all solicitations it received from field painters, renters of field toilets, etc., regarding the Buffalo job. During the same time period, Orr himself contacted Buffalo labor unions and equipment suppliers. On February 22, 1971, Debron sent Orr a letter regarding safety requirements imposed by the Buffalo ironworkers' union and a letter regarding the accidental interruption of utilities on the project.

On February 25, 1971, the Construction Fund sent Debron a letter of intent, authorizing Debron to proceed with the job. This letter of intent specified National Homes as the steel erector.

On March 3, 1971, Debron informed National Homes that it could proceed with its planning and preparation work for the project to commence in late June of 1971. National Homes was informed that a formal purchase order for this work was being processed and would be forwarded shortly.

On March 18, 1971, Debron signed a contract with the Construction Fund and executed two bonds to the Fund. The Construction Fund did not sign the contract until May 27, apparently because of an unexpected soil problem that arose with the foundation contractor. Debron was advised of this problem and immediately notified Orr. Orr agreed that based on the July 1 starting date previously discussed, the schedule could still be met and it was decided that Debron and National Homes would continue to prepare for that starting date.

In late April, Orr called Muehlenbrock to advise him that National Homes would not perform any work on the Buffalo job. Orr offered no explanations. Muehlenbrock then called Burton, who confirmed Orr's message. Burton sent a letter, dated May 3, 1971, stating that Orr had lacked the authority to bid the job, but conceding that Debron had no way of knowing this.

On May 26, 1971, Debron began soliciting bids from other steel erectors. Four erectors expressed interest and Debron sent each of these four a written bid form designed specifically for this job after National Homes refused to perform. The low bid was for $593,299, which price was ultimately paid by Debron. The difference between this price and National Homes' bid was $97,691.00, the amount awarded Debron by the jury.

On May 27, 1971, Debron received the formal contract signed by the Construction Fund, which had been previously signed by Debron. On June 1, 1971, Debron sent National Homes a formal purchase order which utilized the price quotations of $128 per ton and $14 per square originally supplied by Orr on January 11, 1971. The total price, however, was $8,746.00 less than Orr's total price of $495,608. Debron's evidence indicates that the difference resulted from the fact that fewer tons of steel were required than had been originally anticipated. The back of the purchase order contained eleven "Terms and Conditions" which concededly had never been discussed with Orr. National Homes refused to sign the purchase order.

*Promissory Estoppel in Missouri*

The original negotiations and the alleged "offer" made by National Homes took place in Missouri and it is agreed that the law of the State of Missouri applies.

Debron urges that the Missouri courts follow § 90 of the Restatement of Contracts, which reads as follows:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.[1]

National Homes argues that the doctrine of promissory estoppel, although recognized by Missouri courts in some cases, is not applicable to construction contracts, citing Sharp Bros. Contracting Co. v. Commercial Restoration, Inc., 334 S.W.2d 248 (Mo.App.1960). We find that case distinguishable from the facts here. In *Sharp Bros.*, the subcontractor's bid expressly stated that the bid was subject to acceptance within ten days. The plaintiff did not accept within that time and was accordingly denied recovery.[2] Promissory estoppel was not raised in *Sharp Bros.*

The doctrine of promissory estoppel has been approved in several Missouri cases. Early cases applied the doctrine to gratuitous promises. *See, e. g.*, School District v. Sheidley, 138 Mo. 672, 40 S.W. 656 (1897); Pitt v. Gentle, 49 Mo. 74 (1871). However, as early as 1909 the Supreme Court of Missouri, in a 4–3 decision, adopted the doctrine in a commercial transaction. Underwood Typewriter Co. v. Century Realty Co., 220 Mo. 522, 119 S.W. 400 (1909). There the court stated:

That performance, on the strength of the offer made, having been accomplished at an outlay of time and labor on the part of the offeree or promisee, with defendant's knowledge as alleged in the petition, makes it enforceable against the offeror or promisor

. . . .

*Underwood Typewriter, supra* at 403. This doctrine has found further support in later Missouri cases. *See, e. g.*, In re Jamison's Estate, 202 S.W.2d 879 (Mo. 1947); Aden v. Dalton, 341 Mo. 454, 107 S.W.2d 1070 (1937). We find it significant that in the former decision the court relied upon the application of promissory estoppel set forth in the South Dakota decision of Northwestern Engineering Co. v. Ellerman, 69 S.D. 397, 10 N.W.2d 879 (1943). There the court was presented with facts similar to the situation here, when a subcontractor withdrew his bid after a prime contractor had relied upon the bid in submitting an overall bid. The South Dakota court rejected the early decision written by Judge Learned Hand in James Baird Co. v. Gimbel Bros., 64 F. 2d 344 (2d Cir. 1933). The court in *Ellerman* stated:

In spite of this opinion [*Baird*], we believe that reason and justice demand that the doctrine be applied to the present facts. We cannot believe that by accepting this doctrine as control-

---

1. For a fuller discussion of the doctrine of promissory estoppel, *see* Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343 (1969); Boyer, Promissory Estoppel: Requirements and Limitations of the Doctrine, 98 U.Pa.L.Rev. 459 (1950).

2. One writer has analyzed *Sharp Bros.* and its effect on Missouri law as follows:

*Sharp Bros.* does seem to stand for at least this: that where an offeror places a time limit upon his offer, there can be no reliance such as is necessary for promissory estoppel, because the stated time lim-

it informs the offeree, "you may not rely upon this offer after the time limit has expired." However, the case cannot be safely said to go as far as Learned Hand's opinion in *Baird*, rejecting the application of promissory estoppel to any commercial transaction wherein the offeror simply calls for an acceptance. Quite possibly, only a case involving an offer without such a time limit will settle how far Missouri courts will go in applying promissory estoppel to this type of commercial transaction.

28 Mo.L.Rev. 143, 145–146 (1963).

ling in the state of facts before us we will abolish the requirement of a consideration in contract cases in any different sense than an ordinary estoppel abolishes some legal requirement in its application.

*Ellerman, supra,* 10 N.W.2d at 884.

Similar application of the rule of promissory estoppel in construction bid cases is found in Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc., 291 Minn. 113, 190 N.W.2d 71 (1971); Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818 (1964); Drennan v. Star Paving Co., 51 Cal.2d 409, 333 P.2d 757 (1958).

■ We are satisfied that Missouri recognizes the doctrine of promissory estoppel in commercial transactions as well as in situations involving gratuitous promises and we find no logical reason why construction contracts should be distinguished from any other commercial or business transaction.

*Sufficiency of the Evidence*

■ Under § 90 of the Restatement, it is necessary for the plaintiff to prove three basic contentions: (1) a promise, (2) the promisee's reliance, and (3) an injustice which can be avoided only be enforcement of the promise. We find the factual proof by Debron was sufficient to meet its burden and to allow a jury to find in its favor.

■ Although the traditional contract element of "mutuality" may be absent in promissory estoppel cases, a binding offer in the form of a promise by the subcontractor is still a prerequisite to recovery. In the present case it is argued that no such promise was made because there were no specific words of commitment and understanding as to the terms of performance required of National Homes. National Homes relies upon this court's decision in Thos. J. Sheehan Co. v. Crane Co., 418 F.2d 642 (8th Cir. 1969). In *Sheehan*, a suit based upon an alleged breach of contract, a supplier of copper tubing quoted a price to the Sheehan Company as an estimate of cost to enable the Sheehan Company to make an overall bid on a building project. The quotation was based on what was known as a "Chase Sheet" and there was a clear notation on the sheet that the prices might fluctuate from time to time. This court stated:

> Prices and price factors quoted by suppliers to contractors for the purposes of aiding contractors to make bid estimates, without more specific terms, do not obligate the supplier to comply with any purchase order upon whatever terms and conditions the contractor may choose to offer at some undetermined date in the future.

*Sheehan, supra* at 645.

In *Sheehan*, there was only an invitation to make an offer in the future. *Cf.* Robert Gordon, Inc. v. Ingersoll-Rand Co., 117 F.2d 654 (7th Cir. 1941). There was no firm offer to supply a given quantity of material. The factual proof is much different here. In the present case we are not dealing with a supplier of material simply quoting a current market price of his product. Here the bid made by National Homes was for the erection of a specific building and the price submitted was based on a specific quantity of structural steel involved. Implicit within the promise was the knowledge of Debron that National Homes had inspected the specifications and visited with Debron personnel to review the plans for the job. The facts show a sufficient promise by National Homes that it would perform a specific job at a certain price.

We turn then to the question of Debron's reliance. There can be little question that National Homes' bid was submitted with a reasonable expectation that it would induce action of a definite and substantial character on the part of Debron. The evidence is undisputed that Orr knew at the time he submitted the bid that Debron was going to use its bid on the overall construction project. Debron did in fact use Orr's bid.

Unlike *Sharp Bros., supra,* there was no time limit expressed by National Homes as to when Debron had to accept

the bid. In any event, Debron immediately informed National Homes that it was the only bidder and that it was going to use its bid and that it would be the subcontractor for the erection work, assuming, of course, that Debron was awarded the main contract. As soon as Debron received notice of the award of the contract, it informed National Homes of this fact and Orr continued to meet with the owners as well as with Debron personnel to make plans for carrying out the contract. National Homes had full knowledge of the detriment incurred by Debron and there cannot be any argument that the offer itself was not accepted within a reasonable time. We agree with the general proposition that a contractor should not be free to delay acceptance after he has been awarded the general contract in hopes of getting a better offer. But that did not happen here. Nor was there any attempt to reopen bargaining with the subcontractor. If any of these events had taken place, the result here would be different. Debron promptly informed the defendant that he was being awarded the job and the defendant acted accordingly. *Compare* Drennan v. Star Paving Co., 51 Cal.2d 409, 333 P.2d 757, 760 (1958).

In addition to submitting National Homes' bid, Debron relied on its continuing relationship with National Homes as it proceeded to meet with the Construction Fund. With the understanding that National Homes was going to perform its bid, Debron went ahead and ordered the steel, made contracts with painters, laborers, and held several meetings with the Construction Fund. In addition, in signing the contract with the Construction Fund it put up two performance bonds at great expense to it. National Homes pursued the project and continued to reaffirm its bid and its promise to perform the job. This reaffirmation by its own conduct not only increased Debron's assurance that it could rely upon National Homes' bid, but lulled it into a sense of security so that it further pursued the various steps that it took in preparing for the project. In view of this justifiable overall reliance, we are satisfied substantial injustice would occur here without enforcement of the promise.

■ The trial court denied recovery because: (1) the price specified in Debron's purchase order was $8,746.00 less than Orr's original quotation, (2) there was a change in the starting date, and (3) the back of the purchase order contained eleven new "Terms and Conditions." These factors overlook that National Homes' renunciation and withdrawal of its offer was based solely on the allegation that Orr did not have the authority to bid on any job in the State of New York.[3] This was the only reason offered by National Homes for its refusal to perform.

■ These events after the renunciation are irrelevant to the determination of whether or not there was a substantial detriment induced by the original promise.[4] *See* Railway Co. v. McCarthy, 96 U.S. 258, 24 L.Ed. 693 (1877); Rain-

---

3. There can be no contention nor is there any claim here that Orr did not have the authority, or at least the apparent authority, to act on behalf of National Homes in the manner he did. Orr testified that Burton never told him he could not make this bid. In fact, the evidence shows that Burton was kept informed of Orr's progress on this particular bidding project. Moreover, the law is clear that National Homes would be estopped to deny Orr's apparent authority under the circumstances here. *See* Wayne v. New York Life Ins. Co., 132 F.2d 28 (8th Cir. 1942); State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42 (1946); Koewing

v. Greene County Bldg. & Loan Ass'n, 327 Mo. 680, 38 S.W.2d 40 (1931); Edwards v. Thomas, 66 Mo. 468 (1877).

4. In a similar situation the Arkansas Supreme Court gave little weight to this kind of argument. In Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818, 820 (1964), the court stated:

As a secondary argument Reynolds contends that his offer was revoked by a counteroffer made by Texarkana. The exact terms of the proposed subcontract had not been discussed by the parties when Reynolds submitted his bid. Later on, after Texarkana had obtained the principal

ier v. Champion Container Co., 294 F.2d 96, 102 (3d Cir. 1961); Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818 (1964).

Nevertheless, even if the subsequent events are considered, there is no basis for holding that Debron so altered the terms of the agreement as to constitute a counter-offer. The price differentiation in the purchase order of $8,746.00 was explained by Debron as resulting from a slightly lower tonnage requirement than had originally been anticipated. The jury could find this to be true. This naturally would affect the total price since Orr's original bid was on a per ton basis. The purchase order does in fact adhere to Orr's quoted unit prices of $128 per ton and $14 per square.

On the question of the starting date, witnesses testified that Orr agreed with Debron personnel before the National Homes revocation that the job need not start until July. This testimony conforms with the estimate sheets found in Orr's file. National Homes claims that the May starting date was crucial because the cost of the job would increase if it extended into the winter months; however, even under the July 1 date, the evidence shows the job would still have been completed in good weather.

We have examined the terms and conditions on the back of the purchase order and find nothing within these terms which National Homes should not have expected to be included in any contract. They are standard clauses. *Cf.* Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818, 820 (1964).

National Homes claims that it would not have agreed to the term requiring it to post a bond; however, Orr's estimate sheet indicates that National Homes did intend to put up the bond.

Thus, even if the circumstances subsequent to the renunciation of the promise are considered, there is sufficient evidence to allow the case to go to the jury.

Judgment reversed and remanded with instructions to reinstate the verdict with interest to be awarded from the date of the verdict.

---

contract, Texarkana sent Reynolds a mimeographed subcontract. Reynolds now says that the proffered agreement contained several clauses, such as a performance bond requirement and daily liquidated damages for delay, that he would never have agreed to. Hence, he insists, the proposal amounted to a counteroffer that constituted a rejection of his bid. Smith v. School Dist. No. 89, 187 Ark. 405, 59 S.W.2d 1022.

The trial court may well have doubted whether Reynolds would actually have refused the subcontract if it had contained a price sufficient to assure him of a profit. In any event, however, we think the present contention to be an afterthought that comes too late. Reynolds rejected the proposed subcontract upon the sole ground that he could not do the work for the price that was offered. His conduct in that respect constituted a waiver of the objections that are now leveled against Texarkana's proposal.