GERTRUDE McGOWAN SEARLS *vs.* THE STANDARD ACCIDENT INSURANCE COMPANY & another
(and a companion case [1]).

Middlesex.    May 3, 1944. — June 27, 1944.

Present: FIELD, C.J., QUA, RONAN, & WILKINS, JJ.

*Insurance,* Disclaimer of liability, Motor vehicle liability insurance. *Waiver. Estoppel.*

Evidence, at the hearing of a suit in equity to reach and apply the obligation of the insurer under an automobile liability insurance policy in satisfaction of a judgment recovered against the insured by the plaintiff in an action for personal injuries sustained when he was struck by the automobile, did not show to be plainly wrong a finding that the insurer, after it had defended the action up to a verdict for the plaintiff, was barred from disclaiming liability on the alleged ground of failure of the insured to coöperate as required by the policy, because, although the insured had stoutly asserted that he was not operating the automobile at the time of the accident, the insurer had sufficient information before the trial of the action to show palpable falsehood in the insured's assertion and to warrant a disclaimer.

[1] The companion case is by John J. McGowan against the same defendants.

Two BILLS IN EQUITY, filed in the Superior Court on August 12, 1941.

The suits were heard by *Dowd*, J.

*F. P. Garland*, for the defendants.

*W. E. Kane*, for the plaintiffs.

WILKINS, J.    The plaintiffs, a minor and her father, are the holders of judgments against the defendant O'Brien for bodily injuries and for consequential damages, respectively, arising from her being struck by an automobile on a public way in Woburn in this Commonwealth.    These bills in equity under G. L. (Ter. Ed.) c. 175, § 113, and c. 214, § 3 (10), are to reach and apply in satisfaction of their judgments the obligation of the defendant insurance company, hereinafter called the company, under an automobile liability policy.    The company's answers set up that the policy contained the following "cooperation" clause, which was made a condition precedent to bringing action thereon: "The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."    The answers also alleged that the defendant O'Brien failed to comply with this clause to the prejudice of the company; that "the assured was guilty of fraud, in that he falsely represented to the defendant [company] that he was not operating the automobile involved in the accident and was not present at the scene of the accident when it occurred"; and that this was a representation of a material fact on which the company relied to its prejudice.    The bills of complaint were taken for confessed against the defendant O'Brien, and the suits were then heard by a judge, who entered final decrees ordering the company to pay the amounts of the judgments with interest.    The company appealed, and the cases are here with a report of the testimony.

The judge filed in each case a "statement of findings, rulings and order for a decree."    These findings were voluntary, and do not purport to contain all the material facts.    See *Birnbaum* v. *Pamoukis*, 301 Mass. 559, 562; *Restighini* v. *Hanagan*, 302 Mass. 151, 154–155.

The facts found or admitted may be briefly summarized. The automobile was registered in Maine, and was owned by one Frank O'Brien, the father of the defendant O'Brien and a resident of Maine. The policy, which was issued in Maine to the owner on April 11, 1938, contained an extra-territorial clause covering operation on the highways of this Commonwealth and included within its protection "any person while using the automobile" with the permission of the named insured. The accident occurred on January 5, 1939, on which date the defendant O'Brien, hereinafter called O'Brien, was using the automobile with his father's permission, and hence by the provisions of the policy was an "insured" entitled to its protection and was by the same token charged with compliance with the coöperation clause quoted in the company's answers. The writs in the tort actions were dated May 6, 1939. The company's counsel represented O'Brien at the trial, which resulted in verdicts for the plaintiffs on May 16, 1941. On May 17 the company sent a letter to O'Brien disclaiming liability. On May 20 the company's counsel withdrew their appearance, and on June 9 judgments were entered on the verdicts. It was stipulated at the hearing that O'Brien was in fact operating the automobile and was present at the scene of the accident at the time the minor plaintiff was injured. The foregoing was undisputed, but the judge also made certain findings, which are the basis of the controversy in this court, to the effect that by reason of the company's knowledge or means of knowledge the disclaimer came too late.

The contract of insurance, having been made in the State of Maine, is governed by the law of Maine, and may be enforced here in the present procedure, but the plaintiffs have no greater rights than the insured. *Klefbeck* v. *Dous*, 302 Mass. 383, 384. The Revised Statutes of Maine (1930), c. 60, provide: "The liability of every company which insures any person, firm, or corporation against accidental loss or damage on account of personal injury . . . shall become absolute whenever such loss or damage for which the insured is responsible, occurs" (§ 177). "None of the provisions of . . . [§ 177] shall apply . . . (6) when there

is fraud or collusion between the judgment creditor and the insured." (§ 180). By the law of Maine the giving by the insured of intentionally false information as to the details of the accident would be fraud constituting a defence under the statute to an action on the policy. *Medico* v. *Employers Liability Assurance Corp. Ltd.* 132 Maine, 422. *Laforge* v. *LeBlanc*, 137 Maine, 208, 212. This would also be a breach of the "cooperation" clause. *United States Fidelity & Guaranty Co.* v. *Wyer*, 60 Fed. (2d) 856, 858, certiorari denied, sub nomine *Wyer* v. *United States Fidelity & Guaranty Co.* 287 U. S. 647. *Buffalo* v. *United States Fidelity & Guaranty Co.* 84 Fed. (2d) 883, 885. *Brogdon* v. *American Automobile Ins. Co.* 290 Mich. 130, 135. *Bassi* v. *Bassi*, 165 Minn. 100, 102. *Finkle* v. *Western Automobile Ins. Co.* 224 Mo. App. 285, 296. *Coleman* v. *New Amsterdam Casualty Co.* 247 N. Y. 271, 276. *Seltzer* v. *Indemnity Ins. Co.* 252 N. Y. 330, 335. *S. & E. Motor Hire Corp.* v. *New York Indemnity Co.* 255 N. Y. 69. *Conroy* v. *Commercial Casualty Ins. Co.* 292 Penn. St. 219, 225. *Francis* v. *London Guarantee & Accident Co.* 100 Vt. 425, 430. *Buckner* v. *Buckner*, 207 Wis. 303, 309, 310. *Hunt* v. *Dollar*, 224 Wis. 48, 53. As many of the cited cases show, it is immaterial whether the intentionally false information be an overstatement or understatement of the facts bearing upon liability. Coöperation requires that there must be an effort to tell the truth no matter who is helped or hurt. There is nothing more mischievous in litigation or destructive to the administration of justice than the deliberately untruthful witness, be he apparently aiding in preparation for trial or committing perjury on the stand.

"The company, however, could not, after having acquired information sufficient to warrant a disclaimer, continue in defence of the action and, upon the rendition of an adverse verdict, then for the first time rely upon such information and withdraw. It was bound to exercise good faith and due diligence." *Klefbeck* v. *Dous*, 302 Mass. 383, 387. See also *Daly* v. *Employers Liability Assurance Corp. Ltd.* 269 Mass. 1, 4; *Barbeau* v. *Koljanen*, 299 Mass. 329, 332, 333; *Restighini* v. *Hanagan*, 302 Mass. 151, 153; *Colby*

v. *Preferred Accident Ins. Co.* 134 Maine, 18. As was said in *Goldberg* v. *Preferred Accident Ins. Co.* 279 Mass. 393, 399, "the insurer is placed in a position in which it must separate itself from the defence decisively and completely if it desires to insist upon its right to disclaim upon breach of the condition."

The judge's ruling in each case that the company, "having assumed the defence of said tort action, and having carried it to verdict, cannot now rely on the knowledge and information which it had at the time of said trial as a defence to this action" was, accordingly, correct provided his specific findings did not necessarily preclude such a ruling. See *Birnbaum* v. *Pamoukis*, 301 Mass. 559, 562. This the findings did not do. It is, however, open to the company to contend, as it does, that the following findings as to disclaimer were plainly wrong: "I find that on and before the date of the trial of said tort case, as a result of investigation by its agents, all the facts concerning the alleged accident which said insurance company now adduces in defence of this action were or could have been within its knowledge and possession. I find that such knowledge was sufficient to warrant the filing of a disclaimer by said company refusing to defend said action of tort."

Much of the material evidence was documentary. From a statement dated January 9, 1939, given by O'Brien to one Paul, an agent of the company in Auburn, Maine, it appeared that he was thirty years of age, and had been in Woburn with his father's automobile on January 5, 1939, from about 5:45 P.M. until about 11 P.M.; that from shortly after 8:15 P.M. until he left to drive to Haverhill he was at the house of one Regan in Woburn; that on the following day when he returned the automobile to his father in Auburn the latter asked if he had been in any accident, and he said that he had not; that his father told him that according to the Woburn police he had hit and knocked down a girl; that he returned to Woburn with his father to plead on January 7 in two criminal cases arising out of the accident; that he was released under bonds, and the cases were postponed until January 27. From a report

dated January 30, 1939, by one Gilbert, an investigator of the company, it appeared that the minor plaintiff on January 5 at 10:15 P.M., while crossing Montvale Avenue accompanied by two women, was struck by an automobile bearing. Maine registration plates and traveling on the left side of the road; that the operator, a man aged about thirty or thirty-five, got out; that the minor plaintiff was lying in the gutter; that when one of the women told the operator that he would have to help her, the operator got into the automobile and drove away; and that three persons took the registration number.

On January 27, 1939, O'Brien, who had pleaded not guilty to the two criminal charges in the Fourth District Court of Eastern Middlesex, "assented to a guilty finding." On a charge of operating an automobile so that the lives and safety of the public might be endangered, he was fined $100, which he paid. On a charge of going away after knowingly colliding with or otherwise causing injury to a person without stopping and making known his name, residence, and the number of his automobile, he was given a suspended sentence of three months in the house of correction. In answer to interrogatories the company stated that it acquired knowledge of what occurred in the criminal cases shortly after January 27.

A report, dated December 16, 1939, addressed to the company by one Sweetser, an investigator, contained the following: "It is not entirely clear to me what your attitude is in reference to Francis O'Brien being the actual operator of the car at the time of the accident. I called upon him and I was amazed to learn even at this time, he denies that he was the operator of the car at the time it was involved in an accident. He assumes with so much evidence in favor of it, his father's car or the one he was operating must have been in the accident but he, himself, denies any connection. This statement is still made by him even though he has been found guilty of driving so as to endanger and leaving a scene of an accident. . . . Perhaps I should not say this in fairness to him, but . . . his first appearance . . . gives one the impression that he

is not telling the truth. . . . In my opinion, whether he is telling the truth or not, he gives one the impression he is covering up something. The father, or the assured, appears to be a high class business man. . . . I threatened, begged and pleaded with Francis and I could not get him to admit that he was the driver of the car that was involved in the accident. He tells me he has never admitted this to anyone. His father has never been able to get him to admit it, although his father tells me, in the presence of Francis, if he was on a jury, hearing the evidence they had against Francis, he would have to convict him. His father thinks he was operating the car but his own father could not get him to admit it, therefore, our assured says he must give Francis the benefit of the doubt. . . . His father was perfectly willing I should say anything to Francis to see if we could get him to admit the accident but he still sticks to the story. With his father's permission, I told Francis he would have to defend the case himself. I also told Francis it was time his company received the truth of the accident and if he did not tell us the truth now I was inclined to believe the company would decline coverage, explaining if this did happen there would be attachments on his automobile and business and he and his father might have to pay a substantial verdict themselves. He still stuck to his guns. . . . He first said he parked his car in front of the Regan home and when he came out it was at the side entrance. He now says he does not know exactly where he stopped the car when the car was parked and he entered the house and he might have parked his car where he found it when he got ready to go to Haverhill. Neither he or the assured denies the fact that the automobile itself was involved in the accident. . . . I am not unmindful of the record of the criminal court, but it would be some surprise to me if our driver would ever say now he was driving the car and I am only trying to show you what you are up against. . . . I discussed this matter with Mr. Paul. He, probably like everyone else, thinks Francis was operating the car.''

Under date of April 30, 1941, one McDermott, an investigator for the company, took a signed statement from O'Brien.

This showed that on January 5, 1939, O'Brien arrived at Regan's house around 8:30 P.M.; that when he arrived he parked the automobile in the driveway alongside the house and remained there until around 11 P.M.; that he left his keys in the automobile; that when he left, the automobile was not in that driveway but in a dead end driveway about thirty yards down the street; that at no time was the automobile parked directly in front of the house; that he was definitely not driving any automobile that was involved in a hit and run accident in Woburn on January 5, 1939; that if the automobile was involved in an accident on that date, someone must have taken it while he was in Regan's house; and that he was questioned several times by the police and denied at all times that he was involved in any accident on that date.

From a report dated May 1, 1941, from McDermott to the Boston office of the company to which was attached a copy of the signed statement of April 30, 1941, it appeared that, when asked by McDermott if he still stated that he was not driving the automobile on the night of the accident, O'Brien answered "emphatically" that he was not; that O'Brien tried to impress upon McDermott "that he had been sort of put in the middle in this case" by his uncle, the police officer, and that he never should have accepted the finding of guilty in the first place, because he was not driving the automobile; that O'Brien stated that his uncle told his father and him that the best way was to plead not guilty and admit a finding of guilty, but that O'Brien believed that his uncle just wanted to get the case off the books and get it over with, and, therefore, "he took it on the chin."

There also was oral testimony. The police chief of Woburn testified that he talked with one Gilbert, a representative of the company, about O'Brien's story to the effect that he had left the automobile in front of Regan's house, and that when he later went out he found it parked in the driveway alongside the house; that he asked Gilbert if he thought that was plausible; that Gilbert replied it would be hard to believe that anybody would go out with an automobile, cause the accident, and bring it back to the place from which

it was allegedly stolen; that he told Gilbert of a conversation in which he had said to O'Brien that he could not believe this story and did not think any one else would believe it; and that O'Brien had responded, "I must have been the driver of the car." There was other testimony from the claims manager of the company's Boston office and from the attorneys who had handled the tort cases for the company showing that they had talked to O'Brien on May 14, 1941, just as the trial was about to begin, and had brought to his attention certain things, including the fact that Regan had told them that the morning following the accident he had received a call from O'Brien, who asked Regan to say he had not left the house until midnight; that it was pointed out to O'Brien the serious situation he would be in if the judge should feel he had committed perjury; that O'Brien had replied he could not change in any way what he had previously told them; that O'Brien had told a consistent story throughout on which they relied notwithstanding the proceedings in the criminal court and the reports of the company's investigators; and that there was no absolute knowledge that O'Brien was the operator of the automobile until after the jury's verdicts.

It was not plainly wrong to find that the company had elected to continue with the defence of the tort actions after it had sufficient information to warrant a disclaimer. The verdicts revealed no new fact bearing on the company's knowledge. To be sure, it was thereby demonstrated that the jury were not deceived by O'Brien's story, but this was merely the consequence of a decision to try the cases to the ultimate end. It was never questioned but that the accident was caused by the O'Brien automobile. The identity of the operator was from the outset the one fact in doubt. O'Brien's incredible explanation, openly disbelieved by his own father, by the chief of police and by at least one company investigator, O'Brien's inconsistent statements both as to the place where he left the automobile and the place where he later found it, the assent to be adjudged guilty of two crimes which could have been committed only by the operator of the automobile, the statement of the police chief

to a company investigator — who was an "agent to know," *Cotter* v. *Nathan & Hurst Co.* 218 Mass. 315, 317 — that O'Brien said that he must have been the operator, Regan's statement that O'Brien asked Regan to give a false hour for his departure, were some of the facts known to the company before the opening of the trial of the tort actions. It was not clearly erroneous for the judge to conclude that O'Brien's stubborn adherence to a course of palpable falsehood was a factor known to the company before the recording of the verdicts, and that it could not thereafter for the first time rely upon such factor and withdraw.

The present cases are distinguishable from *Sanborn* v. *Brunette*, 315 Mass. 231, where it was held that the judge was not plainly wrong in finding that there had been no waiver of the right to disclaim.

*Decrees affirmed with costs.*