# I & R Mechanical, Inc. *vs.* Hazelton Manufacturing Co.

No. 02-P-1605.

Middlesex. February 3, 2004. - November 10, 2004.

Present: Gelinas, Duffly, & Trainor, JJ.

*Contract,* Offer and acceptance.

In a civil action for breach of contract, no contract was created between the parties where the defendant forwarded by facsimile transmission, unsolicited, a manufacturer's price quote for certain boilers to a large number of potential customers without knowledge whether they would be bidding on a certain project, because, under the circumstances, the facsimile constituted, and was intended to be, a mere invitation to offer, and the plaintiff understood this [454-457]; moreover, any reliance by the plaintiff on the quote would have been unreasonable, given that the plaintiff admitted to seeking a lower price for the boilers and did not consider itself bound to purchase the boilers or committed to pay for them, and given that the price disparity between the defendant's price and another price that the plaintiff had received for the same boilers was so great as to be indicative of an error in the defendant's quote [457-461].

CIVIL ACTION commenced in the Superior Court Department on February 20, 2001.

The case was heard by *Wendie I. Gershengorn,* J.

*Alvin S. Nathanson* for the plaintiff.

*Cynthia B. Hartman* for the defendant.

GELINAS, J. In this case we consider whether an unsolicited written quote for three "Mills" boilers — which the defendant Hazelton Manufacturing Co. (Hazelton), a wholesale supplier of heating and cooling equipment, sent by facsimile transmission to plaintiff I & R Mechanical, Inc. (I & R), a subcontractor — rose to the level of a firm offer and, ultimately, a binding contract between the two after I & R relied on the quote in submitting a subbid for related work on a public school building project in Dartmouth. Relying on *Cannavino & Shea, Inc.* v.

*Water Works Supply Corp.*, 361 Mass. 363, 366 (1972), and *New England Insulation Co.* v. *General Dynamics Corp.*, 26 Mass. App. Ct. 28, 30 (1988), a judge of the Superior Court determined after a jury-waived trial that no contract had been formed between the parties, concluding that the unsolicited quote that Hazelton sent I & R was merely an invitation for I & R to make an offer to purchase boilers from Hazelton. Judgment entered in favor of Hazelton on all claims in I & R's complaint. I & R appealed.

*Facts.* We summarize the facts found by the trial judge and supplement with undisputed matter of record. Hazelton distributes boilers manufactured by a company known as H.B. Smith (Smith). In August, 2000, Hazelton received an unsolicited facsimile from Smith quoting a price for three "Mills" type boilers. Smith sent this quotation form to a number of its distributors based on trade publication information that specified the requirement of three Mills boilers for a Dartmouth High School construction job. Unlike in some other quotes, where Smith would quote a retail or "trade" price for the boilers, which the distributor would then discount for sale to commercial customers, Smith here quoted a "net" price of $131,711 for the three boilers and indicated that there were to be no further discounts. The net price, which indicates the cost to the distributor, is typically marked up by the distributor to generate its profit. Instead of marking up the net price, Hazelton here mistakenly considered Smith's quoted price to be the retail or trade price and, in accordance with the industry practice for discounting trade prices, applied a discount multiplier to the net price, reducing it to a "dealer" price of $88,200. Hazelton handwrote this figure and the words "dealer cost" on the Smith quote form next to the net price; initialed it; stamped the quotation with Hazelton's name, address, phone number, and dealer status; and forwarded the quotation, unsolicited, to a number of businesses, including I & R, that Hazelton believed might be bidding on the Dartmouth project.

I & R received Hazelton's facsimile and calculated its subbid for the heating, ventilation, and air conditioning (HVAC) portion of the Dartmouth project using the mistakenly discounted price. Prior to submitting its bid, I & R received an additional

distributor's quote on the Mills boilers from Babbitt Steam Specialty Co. (Babbitt), which, at $146,345, was consistent with the Smith net price marked up for a profit to Babbitt, and was approximately forty per cent more than the Hazelton quote. The Babbitt quote was submitted to I & R on a Smith quotation form identical to Hazelton's except that, on Babbitt's quote, Smith's net price figure was removed.

I & R learned on September 21, 2000, that it had been chosen as the subcontractor. In accordance with industry practice of shopping for the lowest possible price after the bid selection, I & R determined to contact other dealers in an effort to secure the lowest possible price for the boilers. On October 4, 2000, I & R called Hazelton seeking to place an order for the three Mills boilers at its quoted dealer cost. Hazelton informed I & R that its original quotation contained an error and that Hazelton would not sell the boilers for $88,200. Ultimately, I & R paid $140,000 to Babbitt for three Mills boilers and then brought suit against Hazelton, seeking in a breach of contract count to recover the difference between the quoted price and the actual amount paid for the boilers. The trial judge found in favor of Hazelton, ruling that the initial quotation was merely an invitation to I & R to submit an offer, and that the original quote had no binding contractual effect.[1]

*Discussion.* I & R first claims error in the judge's ruling that Hazelton's quotation to I & R did not give rise to a contract. I & R argues that the trial judge was mistaken in relying on *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. 363, 366 (1972), and ignored the more recent and applicable decision of *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757 (1978). We disagree.

We review some general contract principles that bear on this transaction. "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (1981). Contract formation requires a bargain in which there is a manifestation of mutual

---

[1] A second count in I & R's complaint alleged a claim under G. L. c. 93A, which the judge also resolved in Hazelton's favor. I & R makes no separate argument on appeal concerning this claim.

assent to the exchange. *Situation Mgmt. Sys. Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). Restatement (Second) of Contracts § 17(1) (1981). The manifestation of mutual assent between contracting parties generally consists of an offer by one and the acceptance of it by the other. *Id.* § 22(1).

An offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement. *Id.* § 24. See *Montgomery Ward & Co.* v. *Johnson*, 209 Mass. 89, 91 (1911); *Kuzmeskus* v. *Pickup Motor Co.*, 330 Mass. 490, 493 (1953); *Levenson* v. *L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 130 (1991). An offer ripens into a binding contract when it is accepted. Acceptance occurs when the offeree gives the return requested in the offer. Restatement (Second) of Contracts § 50(1) (1981).

Advertisements, price quotations, and price lists generally do not constitute offers but are instead usually considered requests for offers or invitations to negotiate. *Montgomery Ward & Co.* v. *Johnson, supra*; *Mellen* v. *Johnson*, 322 Mass. 236, 238-239 (1948); *Cannavino & Shea, Inc.* v. *Water Works Supply Corp., supra*. See Restatement (Second) of Contracts § 26 comment c (1981). See also 1 Williston, Contracts § 4:7 (4th ed. 1990).

In contract formation, the element of agreement or mutual assent is often referred to as a "meeting of the minds." Restatement (Second) of Contracts § 17 comment c (1981). The parties must give their mutual assent by having "a meeting of the minds" on the same proposition on the same terms at the same time. See *Situation Mgmt. Sys. Inc.* v. *Malouf, Inc.*, 430 Mass. at 878, and cases cited. See also *Otis Elevator Co.* v. *Westchester Fire Ins. Co.*, 50 Mass. App. Ct. 712, 714 (2001).

On the basis of *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. at 366, the trial judge found that there was no meeting of minds. In *Cannavino*, the general contractor sued the supplier for breach of contract. In making a bid, the general contractor relied on price quotations listed in an unsolicited letter, sent by the supplier to twenty-two contractors, detailing materials and prices required for a municipal water main contract. *Id.* at 364. After the general contractor was awarded the project, it learned that the valves listed in the letter did not

conform to the municipality's bid specifications. *Id.* at 365. The general contractor sought to recover the difference between the supplier's quoted price and the higher priced conforming valves. *Ibid.* The court concluded that the price list was only an invitation to bidders to make an offer, and, as there was no meeting of the minds, no contract was formed. *Id.* at 366. The unsolicited letter did not create either a binding offer or promise on the part of the supplier.

Based on a thorough analysis of the transaction, the trial judge here found that Hazelton was a supplier that forwarded a manufacturer's price quotation to potential customers. She further found that Hazelton played no active role in researching project specifications in trade publications; that Hazelton's price quotation was unsolicited by I & R; that Hazelton sent the quotation to a large number of potential subcontractors without knowledge of whether or not they would be bidding on the project; and that Hazelton's quotation applied strictly to supplying a product, and not to performing any services. She ultimately concluded that Hazelton's facsimile constituted, and was intended to be, a mere invitation to offer; that I & R understood this; and that no contract was created between the parties. These findings may not be set aside unless clearly erroneous. Mass.R. Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). *Freyermuth v. Lutfy*, 376 Mass. 612, 615 (1978). Based on the record before us, we conclude that they are not clearly erroneous.

We think *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757 (1978), readily distinguishable. In *Loranger*, there was evidence that the supplier prepared its "quotation" or "estimate" based on information from the architect's office; contacted the general contractor directly by telephone to give the quotation; and proposed in its quotation to actually perform a portion of the work, and not simply supply materials. *Id.* at 759. On this evidence, the court distinguished *Cannavino* and concluded that a jury was warranted in finding that there was an offer or promise, and not merely an invitation to offer. *Id.* at 760. By contrast, we conclude that here there was no error in the application of *Cannavino*, and in the trial court's determination that Hazelton intended merely to invite an offer.

I & R argues that art. 2 of the Uniform Commercial Code

should apply in these circumstances, as the boilers were goods, as defined under G. L. c. 106, § 2-105(1), and Hazelton was a merchant as defined under G. L. c. 106, § 2-104(1).[2] I & R further argues that because Hazelton was a merchant, the trial judge's finding that Hazelton was a supplier rather than a subcontractor is meaningless, and that, under the relevant sections of art. 2, Hazelton's actions constituted a firm offer to sell the boilers to I & R. We again disagree. As a preliminary matter, we think that the distinction between a supplier and a subcontractor has meaning when considering the extent of Hazelton's activities with respect to its relationship with I & R. In *Loranger*, the defendant was clearly a subcontractor; here, Hazelton's activities did not rise to that level, and, as the judge found, it was a supplier circulating a quote for materials rather than a subcontractor bidding for work.[3]

Although art. 2 may have expanded the definition of "contract" and made contracts easier to form, the term "offer" is not defined in the Uniform Commercial Code, and the common law definition remains relevant. See G. L. c. 106, § 1-201(11); *Gilbert & Bennett Mfg. Co.* v. *Westinghouse Elec. Corp.*, 445 F. Supp. 537, 544 (D. Mass. 1977). The trial judge here specifically found that the facsimile transmission was a quote and not an offer, and that I & R understood that. These findings are not clearly erroneous and negate any suggestion by I & R that it reasonably believed that an offer had been made. "[A]n offer creates a power of acceptance in the offeree. . . . . It must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him." *Levenson* v. *L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 130 (1991), quoting from 1 Corbin, Contracts § 11, at 24, 25 (1950).

The trial judge also determined that I & R could not recover on its theory that it had relied on Hazelton's price quotes when

---

[2]We note that a similar argument was made in *Cannavino*; the *Cannavino* court concluded that the issue needed no discussion, where (as here) the quotation circulated did not rise to the level of an offer. See *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. at 365-366.

[3]As well, nothing in the record indicates that Hazelton was a subcontractor or subbidder in the bid submission, as would be required by G. L. c. 149, §§ 44A-44M. The project was a public school building project, and as such would have been subject to the provisions of the statute.

submitting its bid. I & R argues that the judge also misapplied *Loranger* in this regard. Again, we disagree.

With respect to reliance, the court in *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, *supra*, cited to draft Restatement language now appearing in Restatement (Second) of Contracts § 87(2) (1981), which states that "[a]n offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice." In *Loranger*, *supra*, the Supreme Judicial Court determined that there was sufficient evidence to warrant the jury in awarding recovery on the basis of reliance where, as noted above, there was evidence that the supplier prepared its quotation based on architectural information; gave the quotation to the general contractor directly by telephone; and proposed in its quotation to perform some of the work. The Supreme Judicial Court concurred in our holding below, in *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 157 (1978), that the jury could have found not only that in submitting the bid, the supplier knew that the contractor might use it as a figure in a general bid, but knew that, if the figure was used, and the contract awarded to the contractor, the contractor would be bound by its general bid price. Here, the judge's finding that there was no offer, but merely a quote inviting an offer, precludes this analysis. As in the *Cannavino* case, the operative section of the Restatement in this regard is § 26, which provides, "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (1981). In comment c to that section of the Restatement, it is suggested that "[a] 'quotation' of price is usually a statement of price per unit of quantity; it may omit the quantity to be sold, time and place of delivery, terms of payment, and other terms. It is sometimes associated with a price list or circular, but the word 'quote' is commonly understood as inviting an offer rather than as making one, even when directed to a particular customer. But

just as the word 'offer' does not necessarily mean that an offer is intended, so the word 'quote' may be used in an offer. In determining whether an offer is made relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom a communication is addressed." *Id.* § 26 comment c.[4] In concluding that there was no reliance, or, as the concept was then articulated, that the defendant was not estopped,[5] the *Cannavino* court likewise rejected plaintiff's argument that an offer had been made in terms set forth in Restatement (Second) of Contracts § 89B(2) (Tent. Draft No. 2, 1965), now finally adopted in Restatement (Second) of Contracts § 87(2) (1981). See *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. at 365-366.

In concluding that there was no reliance, the trial judge found that I & R expressly reserved the right to shop among suppliers after the subcontract was awarded, and found that I & R admitted that it was actively seeking a better price, that reserving the right to shop the suppliers after a subcontractor is awarded a bid is standard practice in the industry, and that I & R did not intend to be bound by Hazelton's facsimile quote. When considered in the context of comment c to § 26 of the Restatement, *supra*, we think these findings buttress the trial judge's ultimate finding that Hazelton's quote was not an offer but merely an invitation to bidders to make an offer. Restatement (Second) of Contracts § 26 comment a (1981) provides in part, "If the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. 'Reason to know' depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business." Here, the circumstances of the

---

[4]The *Cannavino* court relied on a cognate draft Restatement section. See *Cannavino & Shea, Inc.* v. *Water Works Supply Corp.*, 361 Mass. at 366, citing Restatement (Second) of Contracts § 25 & comment c (Tent. Draft No. 1, 1964).

[5]The *Loranger* court later eschewed the use of the term promissory estoppel in favor of characterizing the situation as one of reliance. *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. at 761.

quote, coupled with the practice of bid shopping and the fact that I & R admitted that it was actively seeking a better price and did not consider itself bound by the quote, gave it "reason to know" that no offer was intended, even though subjectively it might have understood that the quote was an offer.

The trial judge further found I & R had received the Babbitt quote in the amount of $140,000 for the identical boilers, and that it was unreasonable, in light of the great disparity between the quotes (some forty percent), for I & R to have relied on the Hazelton bid, at least without making some attempt to verify the accuracy of the low price, and that any reliance on the quote would have been unreasonable. We think this finding, coupled with the finding that I & R admitted to actively seeking a better price, defeats I & R's argument that the judge erred in her findings that reliance on the quote was not reasonable, even if Hazelton's quote were somehow construed to be an offer rather than an invitation to I & R to make an offer. In other jurisdictions, courts are not disposed to find reliance where contractors act with the intent of driving down the price and actually solicit lower bids, or proceed to rely on the price despite having reason to know there was an error in the bid.[6] See *Robert Gordon, Inc.* v. *Ingersoll-Rand Co.*, 117 F.2d 654, 660-661 (7th Cir. 1941); *Debron Corp.* v. *National Homes Constr. Corp.*, 493 F.2d 352, 358 (8th Cir. 1974); *Drennan* v. *Star Paving Co.*, 51 Cal. 2d 409, 416 (1958); *H.W. Stanfield Constr. Corp.* v. *Robert McMullan & Son, Inc.*, 14 Cal. App. 3d 848, 852 (1971); *Constructors Supply Co.* v. *Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 121 (1971). We hold that, under the circumstances of this case, where according to industry practice I & R admitted to actively seeking a lower price, did not consider itself bound to purchase the boilers or committed to pay for them, and where

---

[6]For a discussion of the practice of "bid chopping" (where a subcontractor, in order to win the subcontract, voluntarily lowers its bid after the general contract has been awarded), and "bid shopping" (where a general contractor seeks a lower bid from other subcontractors after the general contract has been awarded), and a collection of authorities on the question whether a subcontractor is bound by its bid, see *Constructors Supply Co.* v. *Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 115-121 (1971).

the price disparity was so great as to be indicative of an error in the quote, that any reliance here would have been unreasonable.

*Judgment affirmed.*